[225 N.C. App. 556 (2013)]

IN THE MATTER OF T.J.C., K.K.C., B.N.C.

No. COA12-927

Filed 19 February 2013

## 1. Termination of Parental Rights—cessation of reunification efforts—sufficiency of findings of fact—domestic violence

The trial court did not abuse its discretion in a termination of parental rights case by ceasing reunification efforts and initiating termination of parental rights proceedings. There were extensive findings regarding respondent father's history of domestic violence, the impact of that violence on the minor children, and his lack of appreciation of the effect of such violence, even after attending the available programs.

## 2. Termination of Parental Rights—grounds—neglect

The trial court did not err by terminating respondents' parental rights to their three minor children. The findings of fact supported the conclusion of law that the parental rights of both respondents may be terminated on the ground of neglect.

Appeal by respondents from orders filed 16 June 2011 and 12 April 2012 by Judge Stanley L. Allen in District Court, Rockingham County. Heard in the Court of Appeals 31 January 2013.

*No brief for Rockingham County Department of Social Services, petitioner-appellee.*

*Sandlin & Davidian, PA by Debra A. Griffiths for guardian ad litem, appellee.*

*Peter Wood for respondent-appellant, mother.*

*J. Thomas Diepenbrock for respondent-appellant, father.*

STROUD, Judge.

Respondent-mother ("Toni") and respondent-father ("Fred") appeal from (1) a permanency planning order which directed cessation of reunification efforts and initiation of termination of parental rights proceedings, and (2) an order terminating their parental rights as to their three minor children: Brianne, Tom, and Keith.[1]

---

1. To protect the identities of the juveniles and for ease of reading, we will refer to both the juveniles and respondents by pseudonym.

**IN RE T.J.C.**

[225 N.C. App. 556 (2013)]

## I. Background

The three juveniles were born to the marriage of Fred and Toni in May 2001, January 2007, and November 2007. The Rockingham County Department of Social Services ("DSS") first became involved with the family in August 2005 by confirming reports that law enforcement officers had responded to the home multiple times to quell domestic violence. Between 1 May 2006 and 29 May 2010, DSS received several reports of incidents of domestic violence which involved Toni and Fred or Toni and ones of Fred's relatives. During the 29 May 2010 incident, Toni attacked Fred with two knives after he had knocked her to the floor during a fight.

On 18 June 2010, DSS filed petitions alleging that the three children were neglected juveniles. The children were adjudicated neglected on 12 August 2010 by Judge Stanley L. Allen and were placed in the custody of DSS. After several review hearings, Judge Allen directed that reunification efforts cease by order filed on 16 June 2011. Each parent filed a notice to preserve the right to appeal the order ceasing reunification. Thereafter, on 19 August 2011, DSS filed a motion to terminate the parental rights of both parents. The court conducted hearings upon the motion on 3 November 2011, 14 February 2012, and 1 March 2012.

On 12 April 2012, Judge Allen entered an order terminating respondents' parental rights on grounds that (1) they neglected the juveniles, and (2) they left the children in foster care or other placement outside the home without showing that reasonable progress has been made in correcting the conditions which led to the removal of the children. As an additional ground for terminating Toni's parental rights, the trial court concluded that she is incapable of providing for the juveniles' proper care and supervision such that they are dependent juveniles, and the incapability is likely to continue for the foreseeable future.

Although both parents appealed from the order ceasing reunification efforts, only Fred has specifically challenged that order. Both parents challenge the findings of grounds to terminate their parental rights.

## II. Permanency Planning Order

[1] We first address Fred's challenge to the Permanency Planning Order ceasing reunification efforts. "This Court reviews an order that ceases reunification efforts to determine whether the trial court

IN RE T.J.C.

[225 N.C. App. 556 (2013)]

made appropriate findings, whether the findings are based upon credible evidence, whether the findings of fact support the trial court's conclusions, and whether the trial court abused its discretion with respect to disposition." *In re C.M.*, 183 N.C. App. 207, 213, 644 S.E.2d 588, 594 (2007) (citations omitted). Fred argues that although the court's order does recite the findings required by N.C. Gen. Stat. § 7B-507(b)(1) to cease reunification efforts, it "does not, through processes of logical reasoning from the evidentiary facts, find the ultimate facts." Fred does not argue that these findings are unsupported by the evidence. Rather, he submits that the court's findings of fact are essentially "evidentiary facts" and "do not support the ultimate findings of fact that reasonable efforts to reunify the children with their parents would be futile or inconsistent with the juveniles' health, safety, and need for a safe, permanent home within a reasonable period of time."

We are not persuaded by Fred's argument. The trial court did make specific findings of fact on an attached page

> regarding the parent's progress in alleviating the problems that necessitated removal of the juvenile[s], progress that remains to be accomplished before reunification can be achieved, the current visitation plan and whether changes are in the juvenile[s'] best interests, the recommendations of RCDSS and the guardian *ad litem*, and other issues.

The court summarized its findings at the end as follows:

> Despite the parents' efforts to comply with their services agreements and the services provided since the children were removed and during the years prior to removal, domestic violence has persisted on the part of both parents. Further, it appears that, despite some statements to the contrary, the parents continue to have some form of romantic relationship with each other. During joint visits and during transportation to those visits, they have bickered and argued. [Toni] still engages in at least verbal altercations with [Fred], minimizes the problems that she and [Fred] have, has not demonstrated any of the parenting skills she was to learn, has discussed inappropriate topics with the oldest child, and may not be able to rise to the challenge of full-time care of the children alone due in part to her

limited intellectual functioning. [Fred] has not demon-
strated anything that he should have learned from the
ECHO Program, continues to engage in verbal alterca-
tions with [Toni] and has on at least one occasion since
the children's removal physically assaulted her, calls her
repeatedly, blames the domestic violence on her rather
than accepting responsibility, and has acknowledged
that they have continued some form of relationship.
Fred's smoking breaks and focus on [Toni] have
detracted from his bonding with the children during vis-
its. From [Fred's] inability to give much information
about the children during testing, Dr. Holm surmised
that he had been relatively uninvolved with the children,
which is in keeping with his behavior at visits. In short,
both parents are unable to recognize the children's best
interests, continue to expose them to dysfunctional
behavior, and are more focused on making each other
look bad than having the children returned to them.
RCDSS has offered every service imaginable and there
are no additional services to offer. The parents have
continued the pattern of behavior that led to the chil-
dren being removed and there is a great likelihood that
pattern will continue into the future.

Dr. Holm notes that signs are already apparent of
the impact on the children of the domestic violence and
instability. He also notes that the children seem to be
profiting from their out-of-home placement. The chil-
dren have been in foster care since June of 2010. Based
on the length of time the children have been in care, the
parents' refusal or inability to correct the conditions
that led to the removal, and the children's need for a
safe and stable home within a reasonable period of time,
their permanency plan should be adoption.

The court then found that return of the juveniles to the home
would be contrary to their best interests for the reasons set forth in
the order and previous orders, that it will not be possible for the juve-
niles to be returned home immediately or within six months, that DSS
has made reasonable efforts to reunify, and that reunification efforts
are clearly futile and contrary to the juveniles' best interests. The trial
court resolved the material, disputed factual issues in its findings of
evidentiary facts, those evidentiary facts show why the trial court

found the necessary ultimate facts, and the findings as a whole support the trial court's conclusions. Therefore, we hold that the trial court, "through processes of logical reasoning, based on the evidentiary facts before it, [found] the ultimate facts essential to support the conclusions of law." *In re O.W.*, 164 N.C. App. 699, 702, 596 S.E.2d 851, 853 (2004) (citation and quotation marks omitted).

· Fred also submits that the trial court abused its discretion in ceasing reunification efforts because the court ignored evidence that further reunification efforts would not be futile and would not be inconsistent with the children's health, safety, and need for a permanent home within a reasonable period of time. "A trial court may be reversed for abuse of discretion only upon a showing that its actions are manifestly unsupported by reason." *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985). Given the extensive findings regarding respondent-father's history of domestic violence, the impact of that violence on the minor children, and Fred's lack of appreciation of the effect of such violence, even after attending the available programs, we find no abuse of discretion. Therefore, we affirm the Permanency Planning Order ceasing reunification efforts.

### III. Termination of Parental Rights

[2] We now address the parties' arguments with regard to the grounds for termination of their parental rights. Termination of parental rights proceeds in two stages: an adjudication stage and a dispositional stage.

> At the adjudication stage, the party petitioning for the termination must show by clear, cogent, and convincing evidence that grounds authorizing the termination of parental rights exist. . . . Upon determining that one or more of the grounds for terminating parental rights exist, the court moves to the disposition stage to determine whether it is in the best interests of the child to terminate the parental rights.

*In re Young*, 346 N.C. 244, 247, 485 S.E.2d 612, 614-15 (1997) (citations omitted).

Termination of parental rights must be based upon clear, cogent and convincing evidence that grounds authorizing termination of parental rights exist. *Id.*, 485 S.E.2d at 614. We review an order terminating parental rights to determine whether the findings of fact are supported by clear and convincing evidence and whether the conclu-

sions of law are supported by the findings of fact. *In re Shepard,* 162 N.C. App. 215, 221, 591 S.E.2d 1, 6, *disc. review denied sub nom In re D.S.,* 358 N.C. 543, 599 S.E.2d 42 (2004). We conduct *de novo* review of the court's conclusions of law. *In re S.N.,* 194 N.C. App. 142, 146, 669 S.E.2d 55, 59 (2008), *aff'd per curiam,* 363 N.C. 368, 677 S.E.2d 455 (2009).

Parental rights may be terminated upon a finding that the parent has abused or neglected the child. N.C. Gen. Stat. § 7B-1111(a)(1) (2011). A neglected child is one

> who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed for care or adoption in violation of law.

N.C. Gen. Stat. § 7B-101(15) (2011).

"A finding of neglect sufficient to terminate parental rights must be based on evidence showing neglect at the time of the termination proceeding." *Young,* 346 N.C. at 248, 485 S.E.2d at 615. If the child is removed from the parent before the termination hearing, then "[t]he trial court must also consider any evidence of changed conditions in light of the evidence of prior neglect and the probability of a repetition of neglect." *In re Ballard,* 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984) (citation omitted). The court "must assess whether there is a substantial risk of future abuse or neglect of a child based on the historical facts of the case." *In re McLean,* 135 N.C. App. 387, 396, 521 S.E.2d 121, 127 (1999). Neglect may be manifested by "some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment as a consequence of the failure to provide 'proper care, supervision, or discipline.' " *In re Safriet,* 112 N.C. App. 747, 752, 436 S.E.2d 898, 901-02 (1993) (citation omitted).

Both parties challenge certain findings of fact as unsupported by clear and convincing evidence. Both challenge findings suggesting that they have continued to maintain a domestic relationship with each other, that they have continued to engage in acts of violence with each other and other people after the children were placed in foster care, and that it is probable that they will continue to neglect the children.

Toni separately contests findings of fact declaring that she struggled to implement the lessons she learned in classes designed to help her improve parenting skills, to handle conflict without resorting to violence, to meet her own basic needs without significant professional help, and to make progress in correcting the conditions that led to the removal of the children. She argues that the evidence shows that she took her reunification plan seriously, did everything that she was asked to do, and that there was no evidence showing that the violence between respondents negatively affected the minor children.

Fred separately challenges findings of fact indicating (1) he has continued to fail to accept any responsibility for or acknowledge the domestic violence, and (2) he has trouble disciplining the two younger children without demonstrating anger or raising his voice to them. He argues that any evidence of continuing aggression or violence stems from Toni and is clearly not credible.

We are bound by the trial court's findings of fact "where there is some evidence to support those findings, even though the evidence might sustain findings to the contrary." *Id.* at 110-11, 316 S.E.2d at 252-53. Findings of fact not challenged on appeal are presumed to be supported by competent evidence and are also binding. *In re J.K.C. and J.D.K.,* ___ N.C. App. ___, ___, 721 S.E.2d 264, 268 (2012).

The trial court made numerous findings about the respondents' relationship, their progress in learning parenting skills, employment, and other relevant issues. The trial court nicely summarized its findings of evidentiary fact and made the necessary finding of ultimate fact as to the likelihood of future neglect:

> 50. As set out in the above findings, despite both parents' participation in their services agreements, there has been little change in the status of their relationship with each other, no change in [Fred's] acknowledgement of or propensity toward domestic violence, no improvement in parenting skills or parental judgment, no change in [Toni's] ability to handle conflict without resorting to violence, little or no improvement in parenting skills or parental judgment, no change in [Toni's] inability to meet her own basic needs without significant professional help, and little or no progress in correcting the conditions that led to the children's removal from home.

51. There is a high likelihood of repeated neglect if the children were returned to either parent's or both parents' care and custody, for the reasons set out above. All of the factors in Finding of Fact number 50 would make it unlikely that the parents would provide a safe environment and proper care, supervision and discipline for the children in the future.

The evidence supports the trial court's findings that respondents continue to have a close relationship, that their relationship is marked by aggression and violence, that neither respondent has learned proper parental judgment or how to control their aggressive tendencies, and that this environment is harmful to the children.

The social worker assigned to this case testified that she had received multiple anonymous reports that Toni and Fred were cohabiting at Fred's residence. In efforts to confirm these reports, the social worker drove past the residence several times at various times of the day between May and October 2011 and saw Toni's van parked there. On 12 August 2011, she saw Toni talking in the yard with one of Fred's next-door neighbors who was another client of the social worker. Toni's van was parked in Fred's driveway on that occasion. While visiting in Fred's home, the social worker saw on the couch and floor hospital bracelets from Toni's emergency room visits and other materials related to Toni's hospitalization in August 2011. A social worker testified that even after separate visitations were established, each parent would call the other on the telephone and bicker before, during, and after the visitations. The relevance of respondents' relationship is not, as Fred argues, whether they continued to have a romantic relationship, but whether their relationship, whatever it may have been, demonstrated a continuing trend of aggression, violence, and lack of appreciation for how their actions affect the children.

The parents do not contest findings of fact that they said upsetting things in the presence of the children. For example, on 19 April 2011, Fred told the oldest child she looked like a hobo because of her unkempt hair, which caused the child to cry. On the occasion of one child's birthday in January 2012, Fred asked Toni in an angry manner "who [she] was dressing up for," which upset the oldest child. During visits, each parent talked about the other in the presence of the children. Once in March or April 2011, Toni showed the oldest child her new outfit and commented that Fred had broken the belt by grabbing it. At another visit, Fred told the oldest child that he and Toni may be getting back together. The child asked Toni about it and Toni denied

that she was planning to reunite with Fred but at the very next visit, she showed the child pictures of herself with Fred.

The record also contains a letter the oldest child wrote to the court and social worker in which she requested that her parents visit separately "because it doesn't work out so good when there [sic] together." She related in the letter the different emotions she felt when visited by her parents: happiness because she sees them; sadness when her mother tells bad things and her father takes sides with her mother and does not let the child talk; and anger when she is scolded by her paternal grandmother, her parents bicker, and her parents do not spend much time with the child and her siblings.

The court report prepared by the social worker for the court hearing on 10 March 2011 gave the basis for the child's emotions. The social worker related that during the 22 February 2011 visit, Toni "fussed" at the eldest child for being disrespectful to her. When the child attempted to explain her feelings, Fred intervened and told the child that she was going to respect her mother. Later during the visit, Toni badgered the child with questions such as "Do you love me?" or "Why are you mad at me?" Whenever the social worker attempted to protect the child and remove her from the room, both parents became defensive and accused the social worker of turning their children against them.

During a visit in August 2011, Toni told the children that whether they returned home was dependent upon the oldest child. The social worker saw an immediate change in the demeanor of the oldest child, who became distant after Toni made this statement. Even though it was apparent that the oldest child was upset by something Toni said, Toni claimed the visit went well and all of the children enjoyed themselves. This evidence supports the trial court's findings that neither parent has learned proper parenting skills or parental judgment.

Neither party has challenged the findings of fact regarding the multiple acts of domestic violence between the parents during the course of their relationship and the bickering between the parents while riding to and from visits and during initial visits with the children which required DSS to institute separate visits by each parent.

There was evidence to support the finding that respondent-mother has failed to learn how to resolve conflict non-violently, even after attending parenting classes and other programming. The social worker testified at the termination hearing that Toni continued to engage in physical altercations with others and inappropriate conver-

sations with the children even after she had attended domestic violence and parenting classes. She related an incident occurring in the hallway of the courthouse on the day of a hearing on 3 November 2011 between Toni and her mother-in-law in which they engaged in a squabble about a twenty-dollar bill found on the floor. The social worker also testified that Toni told her that in October 2011, she had fought with a niece and blackened the niece's eye, and that on another occasion, she became angry with her sister's partner and put the partner on the hood of a car.

Additionally, there was evidence that Fred has continued to engage in domestic violence. The social worker also testified that Fred admitted to her that he had struck Toni while they were in the bedroom of his home in May 2011. He related that Toni called him by another man's name, which caused him to "lose control." Toni related that Fred choked her on that occasion. Fred argues that Toni's allegations of violence are simply not credible. Assessments of credibility, however, are reserved for the trial court and not reviewable by this Court. "It is elementary that the [fact finder] may believe all, none, or only part of a witness' testimony." *State v. Barr*, ___ N.C. App. ___, ___, 721 S.E.2d 395, 402 (2012) (citation, quotation marks, and brackets omitted). This evidence, including the statements by Toni, supports the trial court's findings that respondent-father has not changed his propensity for domestic violence.

Further, the evidence shows that the violence and aggression of respondents has had a negative impact on the minor children. Brianne, the oldest child, was admitted to a psychiatric hospital after she pointed a knife at another child in her foster home. When respondent-mother was asked at the termination hearing whether she found the knife incident "concerning," Toni responded by questioning why she had not been told about it. There was also evidence that the two younger children had violent emotional outbursts after visiting with respondents, including one instance in which To threatened to cut his younger brother.

The evidence as a whole supports the trial court's findings that respondents continue to act aggressively and violently toward each other and toward others despite the parenting classes and therapy they have attended. The trial court found that both parents had attended the required classes, that both parents love their children, and that the children love their parents. These factors, however important, are not dispositive as to future neglect. The parents must

**IN RE T.J.C.**

[225 N.C. App. 556 (2013)]

have learned the necessary skills to provide proper care and supervision to their children.

The findings of fact reflect that the children lived in an environment injurious to their safety while they resided with their parents. The children witnessed numerous episodes of domestic violence between the parents over the course of several years. After the children were removed from the home, the parents continued to engage in violence with each other and others and to bicker in the presence of the children. Their behavior has had a negative impact upon the children. The evidence supports the trial court's findings that despite participating in available programming, respondents still do not appreciate that their behavior negatively affects their children. This factual history supports the trial court's findings that there is a high likelihood of future neglect and that it would be in the best interests of the children to terminate respondents' parental rights. The findings of fact support the conclusion of law that the parental rights of both respondents may be terminated on the ground of neglect.

As only one ground is needed to terminate parental rights, we need not consider the other ground of failure to make reasonable progress in correcting the conditions that led to the removal of the children from the home. *In re P.L.P.*, 173 N.C. App. 1, 8, 618 S.E.2d 241, 246 (2005), *aff'd per curiam*, 360 N.C. 360, 625 S.E.2d 779 (2006). Therefore, we affirm the order terminating respondents' parental rights.

## IV. Conclusion

We hold that the findings of the trial court in both challenged orders were supported by clear, cogent, and convincing evidence, that the trial court made the necessary findings of ultimate fact, and that those findings supported the trial court's legal conclusions. As a result, we affirm both the 16 June 2011 permanency planning order and the 12 April 2012 order terminating respondents' parental rights.

AFFIRMED.

Judges STEPHENS and DILLON concur.