ARROWOOD, Judge.
Respondent-father appeals from the trial court's order terminating his parental rights as to the minor child "Mary."[2] Although the order also terminated the parental rights of Mary's mother ("respondent-mother"), she is not a party to this appeal. Because the trial court's findings of fact support its conclusion that Mary was reasonably likely to experience further neglect if she was returned to respondent-father's custody, we affirm.
I. Background
Mary was born in May 2013. Soon thereafter, Buncombe County Department of Social Services ("DSS") received a child protective services ("CPS") report that her meconium had tested positive for marijuana. DSS received another CPS report in October 2013 alleging that respondent-mother was using marijuana and crack cocaine while caring for Mary and that respondent-mother and respondent-father ("respondents") had engaged in domestic violence. Both CPS investigations found the parents needed services and DSS provided services to respondents in the Fall of 2013.
On 23 June 2014, DSS received a report that Mary had been left unsupervised in respondents' apartment while respondent-mother was "two doors down smoking crack and using pills." The report further alleged that respondent-father had repeatedly broken off his relationship with respondent-mother due to her crack cocaine use. When interviewed by the investigating social worker, respondent-mother acknowledged using cocaine the previous weekend, but denied leaving Mary unsupervised or using cocaine around her. Respondents both claimed that any breaks in their relationship were the result of "them not getting along" rather than drug use by respondent-mother. On the day of the investigation, respondent-mother was jailed on pending criminal charges, leaving Mary in respondent-father's care. Respondent-father entered into a safety assessment with DSS, agreeing not to allow respondent-mother to have unsupervised contact with Mary. Respondent-mother was released from jail on 7 July 2014.
On 10 July 2014, a test of Mary's hair follicle registered positive for cocaine and a cocaine metabolite. On 17 July 2014, respondent-father informed DSS that he and respondent-mother had resumed living together. Respondent-father explained that he could not take care of Mary while he was at work and had not found a babysitter.
On 3 August 2014, respondents were caught shoplifting and sustained serious injuries when they fell from a "35[-]foot wall" while attempting to flee. Their injuries left them temporarily unable to care for Mary.
DSS obtained nonsecure custody of Mary on 11 August 2014 and filed a juvenile petition alleging she was neglected. The trial court held a hearing on the petition on 14 October 2014. Respondents stipulated to the CPS history detailed in the petition and consented to an adjudication of neglect for Mary. The trial court entered an order on 3 December 2014 adjudicating Mary neglected on the grounds that she did not receive proper care, supervision, or discipline from respondents and lived in an environment injurious to her welfare. The court ordered respondents to obtain substance abuse and mental health assessments and follow any recommended treatment and to complete parenting classes. Respondent-mother was further ordered to obtain substance abuse treatment and submit to drug screens as requested by DSS.
Although respondents were slow to begin work on their case plans, the trial court established a permanent plan of reunification for Mary at the initial permanency planning hearing on 16 December 2014. The court authorized the Child and Family Team ("CFT") to increase respondents' visitation with Mary in response to their performance. After months of steady progress by respondents, respondent-father met with a social worker at DSS on 18 March 2015 and informed her respondent-mother was using crack cocaine and had slashed the tires to his car and attacked him with a knife. The social worker observed "knife marks" on respondent-father's arm.
At a subsequent CFT meeting on 26 March 2015, respondent-mother admitted slashing respondent-father's tires but denied cutting him, instead claiming she left the residence when she became angry. Respondent-father recanted his allegation of violent behavior by respondent-mother and explained that he was "just angry" on the day he met with the social worker.
The CFT reduced respondents' visitation with Mary to two hours per week at DSS headquarters. At her first visitation after the change, respondent-mother advised DSS that she and respondent-father planned to take Mary to Mexico to live with his family if they were unsuccessful in attaining reunification.
At a subsequent permanency planning hearing held on 16 April 2015, the trial court ordered respondents to obtain domestic violence assessments and follow any treatment recommendations. The court suspended this directive at the next hearing. Based on respondents' progress with their case plans, the CFT approved overnight weekend visits with Mary. However, on 27 August 2015, respondents engaged in another domestic violence episode that reportedly involved respondent-mother cutting respondent-father with a knife and slamming his hand in a door. When law enforcement responded to the scene, respondents refused to cooperate. Respondent-mother's behavior toward law enforcement resulted in her being restrained and taken to jail. Respondents failed to attend a CFT meeting scheduled for the following day, and DSS suspended overnight visitation. At the next permanency planning hearing, the court ordered respondent-mother to obtain an anger management assessment and ordered respondent-father to obtain a domestic violence victim assessment.
Respondents' engagement with services waned in late 2015. They also skipped a visitation with Mary while vacationing together in Myrtle Beach in late September and arrived late for a subsequent visit on 1 October 2015, telling the social worker they had forgotten about it. Based on respondents' performance, DSS and Mary's guardian ad litem ("GAL") recommended a permanent plan of adoption. Noting that Mary was not in respondents' home at the time of the episode on 27 August 2015, the trial court declined to change her permanent plan to adoption, but cautioned respondents against further acts of domestic violence. In an order entered 1 February 2016, the court maintained a primary permanent plan for Mary of reunification but added a secondary plan of guardianship.
By the Spring of 2016, respondents were again making significant strides toward reunification. Following successful overnight visits supervised by Mary's paternal grandfather, the court approved a six-month trial home placement with respondents beginning on 15 April 2016.
DSS terminated Mary's trial home placement in May 2016 after substantiating neglect by respondents based on another incident involving substance abuse and domestic violence that took place on 14 May 2016. After a night out drinking at a bar, respondents arrived home intoxicated. Respondent-father came home first. Respondent-mother followed later by taxi, joined by a workplace acquaintance of respondent-father ("Mr. F."), who was also intoxicated. Mary and her paternal grandfather were awakened between 4:00 and 5:00 a.m. by screaming outside the residence. An altercation occurred between respondent-mother and Mr. F., which Mary heard but did not see. When police arrived, they found Mary in the home and observed respondents' intoxicated state. Respondent-mother sustained injuries, but no charges were filed.
Following a hearing in September 2016, the trial court changed Mary's primary permanent plan to adoption with a secondary plan of reunification. Finding that Mary had been in DSS custody for 730 days and that reunification would not be possible within the next six months, the court directed DSS to file a petition for termination of respondents' parental rights within 60 days.
As directed, DSS filed a petition on 15 November 2016 alleging the following grounds for terminating each respondent's parental rights in Mary: (1) neglect; (2) willful failure to make reasonable progress to correct conditions leading to her removal from the home; and (3) willful failure to pay a reasonable portion of her cost of care. See N.C. Gen. Stat. § 7B-1111(a)(1)-(3) (2017). The hearing on the petition was continued several times into June 2017. During this interval, DSS modified respondents' visitation with Mary to require respondent-mother and respondent-father to attend visits separately. The modification followed "aggressive behavior by the respondent mother towards the respondent father during past visitation where [she] was yelling and threw an item at [him] during a visit ..., with the minor child present." The trial court ordered separate visitations for respondent-mother and respondent-father after being advised of the situation by DSS.
The trial court held the adjudicatory stage of the termination hearing on 28 and 30 June 2017, and the dispositional stage on 31 August and 1 and 19 September 2017. In its "Termination of Parental Rights Judgment" entered 9 November 2017, the trial court adjudicated grounds for termination based on respondents' neglect of Mary and lack of reasonable progress. The trial court further determined that terminating respondents' parental rights was in Mary's best interest.
Respondent-father appeals.
II. Discussion
On appeal, respondent-father challenges the trial court's conclusion that grounds exist to terminate his parental rights under N.C. Gen. Stat. § 7B-1111(a)(1) and (2).
In reviewing a trial court's adjudication under N.C. Gen. Stat. § 7B-1111(a),
we must determine whether the [court's] findings of fact are supported by clear, cogent and convincing evidence, and whether the findings support the court's conclusions of law. If there is competent evidence, the findings of the trial court are binding on appeal. An appellant is bound by any unchallenged findings of fact. Moreover, erroneous findings unnecessary to the determination do not constitute reversible error where the adjudication is supported by sufficient additional findings grounded in competent evidence. We review conclusions of law de novo .
In re B.S.O. , 234 N.C. App. 706, 707-08, 760 S.E.2d 59, 62 (2014) (citations and internal quotation marks omitted). "[I]f we determine that the court properly found one ground for termination under N.C. Gen. Stat. § 7B-1111(a), we need not review the remaining grounds." Id . at 708, 760 S.E.2d at 62 (citation omitted).
Under N.C. Gen. Stat. § 7B-1111(a)(1), "[t]he trial court may terminate the parental rights to a child upon a finding that the parent has neglected the child." In re Humphrey , 156 N.C. App. 533, 540, 577 S.E.2d 421, 427 (2003) (citation omitted). A "[n]eglected juvenile" is defined, inter alia , as one "who does not receive proper care, supervision, or discipline from the juvenile's parent ... or who lives in an environment injurious to the juvenile's welfare ...." N.C. Gen. Stat. § 7B-101(15) (2017).
"A finding of neglect sufficient to terminate parental rights must be based on evidence showing neglect at the time of the termination proceeding." In re Young , 346 N.C. 244, 248, 485 S.E.2d 612, 615 (1997) (citation omitted). When a child has been removed from the parent's care for a significant period at the time of the termination hearing,
parental rights may nonetheless be terminated if there is a showing of a past adjudication of neglect and the trial court finds by clear and convincing evidence a probability of repetition of neglect if the juvenile were returned to [his or] her parents.
In re J.W. , 173 N.C. App. 450, 464, 619 S.E.2d 534, 545 (2005) (alteration in original) (quoting In re Beasley , 147 N.C. App. 399, 404-05, 555 S.E.2d 643, 647 (2001) ), aff'd per curiam , 360 N.C. 361, 625 S.E.2d 780 (2006).
A. Findings of Fact
In addition to its detailed findings about respondents' CPS history and the circumstances leading to Mary's initial adjudication as a neglected juvenile in 2014, the trial court made the following findings of fact pertinent to respondent-father's appeal:
61. The minor child has been in the custody of [DSS] for almost three years, as of the date of this termination hearing. Two issues have driven this case since its inception, substance abuse and domestic violence.
62. The respondent mother's substance addiction is longstanding, and untreated. The minor child tested positive for THC at birth. Relatives have reported that they observed the respondent mother to smoke crack in the presence of the minor child. The minor child tested positive for cocaine and cocaine metabolites on July 10, 2014. As of the date of this hearing, the respondent mother has not successfully completed any substance abuse treatment for her addiction to cocaine, despite having almost three years to do so. ...
63. The respondent mother has no insight regarding how continued drug use can harm herself and her child. ...
64. Domestic violence has been a longstanding issue with this family. The respondents had a prior CPS case with [DSS] ... back in 2013, and the issues involved were both substance abuse by the respondent mother and domestic violence[.] At least 3 incidents of domestic violence have occurred during the lifetime of this case, one of which resulted in the termination of a trial home placement. Both respondent parents have generally acknowledged that these incidents occurred, but the specifics of each incident remain clouded by uncounted explanations from the respondents. Most concerning, a knife was used by the respondent mother in the first two incidents, and a knife was at least present and available for use, during the final incident, which disrupted the trial home placement.
65. ... [T]he respondent parents allowed [the trial home placement] to be disrupted by willfully engaging in alcohol abuse and physical violence, knowing that [DSS] was keeping a close eye on this family. The respondent parents willfully chose to get drunk at a bar, and the respondent mother willfully chose to get into a motor vehicle with Mr. [F.] who was also intoxicated. The respondent mother was sufficiently alarmed by the situation to call the paternal grandfather to warn him to remove the minor child. But despite the alarm, the respondent mother willfully chose to bring Mr. [F.] to the home, where the minor child resided, and not surprisingly, violence ensued.
66. In almost 3 years, the respondent mother has not successfully completed any domestic violence services. ...
67. The respondent father has completed his case plan, having successfully completed individual counseling with All Souls. However, despite having engaged in several incidents of domestic violence with the respondent mother, and having realized the dangers involved, he willfully chose to remain with the respondent mother in a romantic relationship. ... The respondent father has engaged in three incidents of domestic violence with the respondent mother, during his involvement with [DSS] and the Court. He has recognized the danger inherent in that relationship, having requested assistance from both his counselor at All Souls and from [DSS Social Worker Luke] Heller, to separate from her and/or to secure a domestic violence restraining order (50-B). He was even given an opportunity for [DSS] to work a reunification plan with him, even after the TPR petition was filed, yet he failed to grasp that opportunity, choosing his relationship with the respondent mother over the safety and ultimate permanence for the minor child. As a result, the respondent father has done nothing to protect the minor child from the respondent mother's substance abuse and from the violence inherent in his relationship with the respondent mother.
....
71. ... The minor child was born positive for marijuana and tested positive for cocaine and cocaine metabolites on July 10, 2014, and the respondent father did not protect the minor child from said exposure. The respondent father continues to engage in incidents of domestic violence with the respondent mother despite the interventions of [DSS] and the Court, as specified above. The respondent parents continue to reside together in the same home. ...
To the extent respondent-father does not contest the court's findings, he is bound thereby.[3] See In re T.J.C. , 225 N.C. App. 556, 562, 738 S.E.2d 759, 763-64, disc. review denied , 366 N.C. 592, 743 S.E.2d 194 (2013).
Respondent-father excepts to the trial court's statement in finding of fact 67 that he has failed "to protect [Mary] from the respondent mother's substance abuse and from the violence inherent in his relationship with the respondent mother." [Citing the court's finding of fact that he completed the requirements of his court-ordered case plan, he contends that he "has not been involved in domestic violence with [respondent-mother] since August 27, 2015." In a related claim, respondent-father challenges the court's statement in finding of fact 71 that he "continues to engage in incidents of domestic violence with the respondent mother"[4] despite completing his court-ordered services.
Initially, we note respondent-father does not separately contest the following portion of finding of fact 64: "At least 3 incidents of domestic violence have occurred during the lifetime of this case, one of which resulted in the termination of a trial home placement .... [A] knife was at least present and available for use, during the final incident, which disrupted the trial home placement ." (Emphasis added). The court's description clearly refers to the drunken incident at respondents' home on the morning of 14 May 2016. To the extent respondent-father would dispute the characterization of the 14 May 2016 incident as "domestic violence," he is bound by the characterization in finding of fact 64. See In re B.S.O. , 234 N.C. App. at 707-08, 760 S.E.2d at 62.
We find the contested portions of findings of fact 67 and 71 to be supported by the hearing evidence. Although witnesses offered varying accounts of the 14 May 2016 incident, as acknowledged in finding of fact 64, the court did not err in finding that respondent-father continued to place Mary at risk of harm as a result of his relationship with respondent-mother, notwithstanding his completion of his case plan. The evidence fully supports the court's finding of fact that, during Mary's trial home placement, respondents jointly engaged in conduct that involved their mutual abuse of alcohol and resulted in violence at the home. Respondent-father does not contest the court's findings of fact that respondent-mother has "long-standing, and untreated" substance abuse issues-including an "addiction to cocaine"-and that she has failed to successfully complete domestic violence treatment. Despite his awareness of these issues, respondent-father remained in a domestic relationship with respondent-mother at the time of the termination hearing, having declined offers of assistance from his counselor at All Souls and his DSS social worker to separate from her and pursue reunification with Mary independently.
While there was no evidence of additional domestic violence subsequent to 14 May 2016, we cannot say the court's finding of ongoing domestic violence in respondents' relationship is in error, given the history of similar acts occurring in June 2013, March 2015, and August 2015. To the extent finding of fact 71 erroneously implies the occurrence of documented acts of domestic violence subsequent to 14 May 2016, we conclude the error is not prejudicial inasmuch as the remaining findings support the court's ultimate conclusion of law adjudicating neglect under N.C. Gen. Stat. § 7B-1111(a)(1). See In re T.M. , 180 N.C. App. 539, 547, 638 S.E.2d 236, 240 (2006) (citation omitted); see also Starco, Inc. v. AMG Bonding and Ins. Services Inc. , 124 N.C. App. 332, 335, 477 S.E.2d 211, 214 (1996) ("[T]o obtain relief on appeal, an appellant must not only show error, but that appellant must also show that the error was material and prejudicial, amounting to denial of a substantial right that will likely affect the outcome of an action.") (citation omitted).
B. Conclusion of Law
Having addressed respondent-father's exceptions to the trial court's findings of fact, we turn to our de novo review of the court's conclusion of law with regard to respondent-father's neglect of Mary:
4. That pursuant to [N.C. Gen. Stat.] § 7B-1111(a)(1) the respondent father has neglected the minor child. The minor child was born positive for marijuana and tested positive for cocaine and cocaine metabolites on July 10, 2014, and the respondent father did not protect the minor child from said exposure. The respondent father continues to engage in incidents of domestic violence with the respondent mother despite the interventions of [DSS] and the Court, as specified above. The respondent parents continue to reside together in the same home. There is a reasonable probability of repetition of neglect as the respondent father has failed to successfully complete court ordered services to address these issues.
As mentioned above, the court expressly found that Mary was previously adjudicated neglected while in respondents' care in 2014 and further noted respondents "stipulated to the adjudicatory findings of fact made by the Court, and did not appeal the adjudication." Accordingly, our review focuses on the court's conclusion that Mary was reasonably likely to experience a repetition of neglect if returned to respondent-father's care. See In re J.W. , 173 N.C. App. at 464, 619 S.E.2d at 545.
Respondent-father claims the trial court erred in failing to credit his changed circumstances at the time of the termination hearing.[5] He points to finding of fact 67, which confirms his completion of all court-ordered services, and repeats his assertion that he has not participated in domestic violence with respondent-mother since August 2015. Respondent-father argues that these facts "negate the trial court's conclusion of law that Mary would be neglected if she was returned to [his] care in the future." We are not persuaded.
As our Supreme Court explained in In re Ballard , 311 N.C. 708, 319 S.E.2d 227 (1984), " 'The trial court must consider evidence of changed conditions [since the prior adjudication of neglect]. However, this evidence of changed conditions must be considered in light of the history of neglect by the parents and the probability of a repetition of neglect.' " Id . at 714, 319 S.E.2d at 231 (emphasis added) (quoting In re Wardship of Bender , 170 Ind. App. 274, 285, 352 N.E.2d 797, 804 (1976) ). "[T]he trial court must admit and consider all evidence of relevant circumstances or events which existed or occurred either before or after the prior adjudication of neglect." Id. at 716, 319 S.E.2d at 232-33.
The court reasonably found respondent-father shared in the responsibility for the violence that occurred at respondents' residence on 14 May 2016. More to the point, respondent-father's decision to continue living with respondent-mother renders immaterial the question of individual responsibility for the violence.
The issue before the trial court was Mary's prospects for further neglect if she were returned to respondent-father's care. As respondent-father shared a residence with respondent-mother, returning Mary to respondent-father also returns her to respondent-mother. Mary's CPS history reflects previous exposure to marijuana and cocaine as a result of respondent-mother's as-yet-untreated substance abuse issues. Similarly, Mary's return to the home places her at risk of respondent-mother's untreated proclivity to engage in domestic violence, which has repeatedly involved the use of a knife against respondent-father and possibly Mr. F. Given these realities, the trial court did not err in concluding that respondent-father failed to address the threat to Mary posed by respondent-mother's substance abuse and domestic violence, notwithstanding the completion of his case plan. See In re D.A.H.-C. , 227 N.C. App. 489, 500, 742 S.E.2d 836, 844 (2013) ; see also In re S.N. , 180 N.C. App. 169, 178, 636 S.E.2d 316, 321 (2006) ("[A]lthough respondent may have made some progress toward his case plan, he did nothing to remedy the fact that he was maintaining a home with S.N.'s mother that rendered him ineligible to receive custody. The respondent father effectively chose S.N.'s mother over S.N.") (citation omitted). Accordingly, we hold the findings support the trial court's conclusion of a probability of a repetition of neglect and its adjudication of grounds to terminate respondent-father's parental rights under N.C. Gen. Stat. § 7B-1111(a)(1).
Because we uphold the adjudication under N.C. Gen. Stat. § 7B-1111(a)(1), we need not address the second ground for terminating respondent-father's parental rights found by the trial court under N.C. Gen. Stat. § 7B-1111(a)(2). The termination order is hereby affirmed.
AFFIRMED.
Report per Rule 30(e).
Chief Judge McGEE and Judge HUNTER, JR. concur.

We use the pseudonym chosen by the parties to refer to the juvenile.

In a footnote to his appellant's brief, respondent-father suggests the trial court failed to apply the requisite "clear, cogent and convincing evidence" standard of proof in making findings of fact 1-59 in the termination order. See N.C. Gen. Stat. § 7B-1109 (2017). Respondent's suggestion is without merit. On the first page of its order, the court explicitly declares its application of the "clear and convincing evidence" standard in making its adjudicatory findings. The fact that the court re-emphasized the standard in finding of fact 60 does not mean that it failed to apply the standard to its earlier findings.

Respondent-father presents this objection as a challenge to the court's fourth enumerated conclusion of law ("Conclusion 4"). Conclusion 4 repeats finding of fact 71 verbatim . Because this portion of Conclusion 4 is in the nature of a finding of fact, we review as such. We will separately address respondent-father's challenge to the conclusions of law contained in Conclusion 4, applying the applicable de novo standard of review.

Although respondent-father identifies 31 August 2017 as the date of the termination hearing, the court concluded the adjudicatory portion of the hearing on 30 June 2017.