IN THE MATTER OF D.A.H.-C., B.H.-C., AND E.H.-C.

No. COA12-1537

Filed 4 June 2013

**1.  Termination of Parental Rights—findings of fact—supported by the evidence**

The trial court's findings of fact in a termination of parental rights case were not erroneous. The trial court did not improperly treat the Court of Appeals' earlier decision in this case as the law of the case. Furthermore, the challenged findings of fact did not lack adequate evidentiary support.

**2.  Termination of Parental Rights—neglected juveniles—findings supported—probable future neglect**

The trial court did not err in a termination of parental rights case by determining that the juveniles at issue were neglected. The

IN RE D.A.H.-C.

[227 N.C. App. 489 (2013)]

trial court's findings of fact, which were either undisputed or supported by competent evidence, indicated that there was a substantial probability that the children would suffer neglect in the future.

Appeal by respondent-mother from orders entered 14 September 2012 and 18 October 2012 by Judge C. Thomas Edwards in Catawba County District Court. Heard in the Court of Appeals on 8 May 2013.

*Lauren Vaughan, for Petitioner-Appellee, Catawba County Department of Social Services.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Joyce L. Terres, for Respondent-Appellant, Mother.*

*Womble Carlyle Sandridge & Rice, PLLC, by Jessica L. Gorczynski, for Guardian ad Litem.*

ERVIN, Judge.

Respondent-Mother Nancy C. appeals from an order terminating her parental rights in D.A.H.-C., B.H.-C., and E.H.-C.[1] On appeal, Respondent-Mother argues that several of the trial court's findings of fact lack sufficient evidentiary support and that the trial court's findings do not support its conclusion that Respondent-Mother's parental rights in the children were subject to termination for neglect. After careful consideration of Respondent-Mother's challenges to the trial court's orders in light of the record and the applicable law, we conclude that the trial court's order should be affirmed.

## I. Factual Background

On 27 February 2008, Respondent-Mother left Evan and an unrelated child, E.G.,[2] in the care of her husband, Armando H. Upon returning home later that day, Respondent-Mother discovered Ethan lying in a bedroom. At the time that Respondent-Mother made this discovery, Ethan was unresponsive, struggling to breathe, and had a very weak pulse. In addition, Ethan was bleeding, had visible bruises on his face,

---

1. D.A.H.-C., B.H.-C., and E.H.-C. will be referred to as "Daisy," "Brandon," and "Evan," respectively, throughout the remainder of this opinion for ease of reading and to protect their privacy.

2. E.G. will be referred to throughout the remainder of this opinion as Ethan, a pseudonym utilized for ease of reading and to protect the juvenile's privacy.

IN RE D.A.H.-C.

[227 N.C. App. 489 (2013)]

and had vomited. Armando H. said that Ethan had fallen in the bathtub. After attempting to contact Ethan's mother for a half hour, Respondent-Mother and her sister-in-law took Ethan to the hospital, leaving Evan and another child with Armando H. Ethan died as a result of his injuries. After admitting that he had thrown Ethan against the bathtub, picked him up by the neck, thrown him onto a bed, and bitten him in the groin, Armando H. was convicted of second degree murder and felonious child abuse and sentenced to more than seventeen years imprisonment.

On the day that Ethan was injured, the Catawba County Department of Social Services took Daisy, Brandon, and Evan into its custody. On 27 February 2008, DSS filed a juvenile petition alleging that Daisy, Brandon, and Evan were neglected and dependent juveniles and obtained the entry of a non-secure custody order authorizing their retention in DSS custody. On 16 June 2008, Judge L. Suzanne Owsley adjudicated Daisy, Brandon, and Evan to be neglected and dependent juveniles. In her adjudication order, Judge Owsley found that, in addition to killing Ethan, Armando H. had frequently hit and raped Respondent-Mother and beaten the other children.

Between the time of the adjudication and the first review hearing on 11 August 2008, Respondent-Mother fully cooperated with the case plan which had been developed for her. Among other things, Respondent-Mother attended and completed parenting classes, underwent a psychological evaluation, participated in counseling, remained gainfully employed, paid child support, and visited the children on a weekly basis. On 1 December 2008, Judge Owsley approved a trial placement of Evan with his father, Raul A. Although Daisy and Brandon remained in foster care, they were allowed to visit Respondent-Mother pursuant to a court-approved visitation plan. A permanent plan of reunification with Respondent-Mother was developed for Brandon and Daisy, while a permanent plan of reunification with Raul A. was developed for Evan.

On 13 April 2009, Daisy and Brandon began a trial placement in Respondent-Mother's home. At a permanency planning hearing held on 18 May 2009, Respondent-Mother and Raul A. expressed the intention to begin living together as soon as they were allowed to do so. Subsequently, Raul A. and Evan moved into the home which had been occupied up to that point by Respondent-Mother, Daisy, and Brandon.

On 1 December 2010, DSS received a report that Raul A. had repeatedly hit Brandon on the back with a belt for not completing his homework on the preceding day. As a result, all three children were

**IN RE D.A.H.-C.**

[227 N.C. App. 489 (2013)]

temporarily placed with their godmother. An investigation into the incident revealed that, although Respondent-Mother had been in the shower at the time of the incident, she had witnessed Raul A. strike Brandon with the belt below his neck. At the time that she was initially questioned about this incident, Respondent-Mother told authorities that Brandon had fallen. After the other children told DSS what had actually occurred, however, Respondent-Mother admitted having observed Raul A. hit Brandon. Although Respondent-Mother admitted that she did not physically intervene to end the violence, she did tell Raul A. to stop and sat next to Brandon.

On 2 December 2010, DSS filed another juvenile petition alleging that Brandon was an abused juvenile and that all three children were neglected juveniles. The children were again placed in foster care. After being interviewed by DSS, Raul A. left the country and was believed to have gone to Mexico. On 24 January 2011, Brandon was adjudicated an abused juvenile and all three children were adjudicated to be neglected juveniles. Judge Owsley also ordered that DSS cease reunification efforts with Respondent-Mother. Respondent-Mother was, however, granted supervised visitation privileges. Although Respondent-Mother appealed Judge Owsley's order ending the requirement that DSS attempt to reunify the children with her, this Court affirmed that order by means of an opinion filed on 20 September 2011.

At a permanency planning hearing held on 12 December 2011, DSS and the guardian *ad litem* recommended that a permanent plan of adoption be approved for all three children. On 12 December 2011, the trial court entered an order establishing a permanent plan of adoption for the children. On 13 March 2012, DSS filed a motion seeking to have Respondent-Mother's parental rights in the children terminated based on neglect and her alleged failure to make reasonable progress in correcting the conditions that led to the children's removal from the home.

Hearings concerning the issue of whether grounds for terminating Respondent-Mother's parental rights existed were held before the trial court on 25 June, 26 June, 23 July, and 20 August 2012. At the conclusion of these proceedings, the trial court determined that Respondent-Mother's parental rights in the children were subject to termination for neglect. After entering a Termination of Parental Rights Adjudication Order on 14 September 2012, the trial court held a disposition hearing on 17 September 2012. On 18 October 2012, the trial court entered an order terminating Respondent-Mother's parental rights in the children. Respondent-Mother noted an appeal from these orders to this Court.

## II. Legal Analysis

### A. Standard of Review

"Termination of parental rights is a two-step process. In the first phase of the termination hearing, the petitioner must show by clear, cogent and convincing evidence that a statutory ground to terminate exists." *In re S.N.*, 194 N.C. App. 142, 145-46, 669 S.E.2d 55, 58 (2008) (citing *In re Young*, 346 N.C. 244, 247, 485 S.E.2d 612, 614 (1997) and *In re Blackburn*, 142 N.C. App. 607, 610, 543 S.E.2d 906, 908 (2001)), *aff'd*, 363 N.C. 368, 677 S.E.2d 455 (2009). "The finding of any one of the [statutory] grounds [for termination of parental rights set out in N.C. Gen. Stat. § 7B-1111(a)] is sufficient to order termination." *Owenby v. Young*, 357 N.C. 142, 145, 579 S.E.2d 264, 267 (2003). In reviewing an order terminating a parent's parental rights in one or more children, this Court must determine whether the trial court's "findings of fact are supported by clear, cogent and convincing evidence and whether these findings, in turn, support the [trial court's] conclusions of law." *S.N.*, 194 N.C. App. at 146, 669 S.E.2d at 58-59. "Clear, cogent and convincing describes an evidentiary standard stricter than a preponderance of the evidence, but less stringent than proof beyond a reasonable doubt," which requires the presence of " 'evidence which should fully convince.' " *N.C. State. Bar. v. Sheffield*, 73 N.C. App. 349, 354, 326 S.E.2d 320, 323 (citations omitted), *disc. review denied*, 314 N.C. 117, 332 S.E.2d 482, *cert. denied*, 474 U.S. 981, 106 S. Ct. 385, 88 L. Ed. 2d 338 (1985). The trial court's conclusions of law, on the other hand, are reviewable *de novo. S.N.*, 194 N.C. App. at 146, 669 S.E.2d at 59. "Once the trial court has found a ground for termination, the court then considers the best interests of the child in making its decision on whether to terminate parental rights. We review this decision on an abuse of discretion standard, and will reverse a court's decision only where it is 'manifestly unsupported by reason.' " *Id.* at 146, 669 S.E.2d at 59 (quoting *Clark v. Clark*, 301 N.C. 123, 129, 271 S.E.2d 58, 63 (1980)) (citation omitted).

### B. Trial Court's Findings of Fact

[1] As an initial matter, Respondent-Mother challenges several of the findings of fact set out in the trial court's termination order. In advancing this argument, Respondent-Mother directs our attention to the following findings of fact:

> 8.  The return of the minor children to [Respondent-Mother] on or about May 18, 2009 was followed soon thereafter by her cohabitation with [Raul A.], who

IN RE D.A.H.-C.

[227 N.C. App. 489 (2013)]

then perpetrated physical abuse on [Brandon], in spite of [Respondent-Mother's] participation in individual counseling and treatment, family counseling and treatment, parenting classes, psychological evaluation, and in-home community support services during the children's first stay in foster care.

. . . .

10. The minor children report frequent physical discipline by [Raul A.] during the entire time that he resided with them in the home of [Respondent-Mother] from mid-2009 until December 2010. However, [Respondent-Mother] continues to deny any knowledge of such physical discipline prior to the physical abuse of [Brandon] on or about November 30, 2010 which led to the children's second removal from the home and placement in foster care.

11. [Respondent-Mother's] relationship with [Raul A.] ended only after [he] was wanted for a probation violation and absconded to Mexico.

. . . .

16. In large measure, [Respondent-Mother] repeated the services completed after Adjudication following Adjudication II. Unfortunately, [Respondent-Mother] did not protect [Daisy], [Brandon], and [Evan] . . . from violence . . . after the multiple services offered. There is little to suggest that [Respondent-Mother] has the ability to reject her acknowledged "culture of violence" or "duty to her husband," at the peril of her children as evidenced by [Respondent-Mother's] continuing history of minimizing and misleading authorities regarding the nature and extent of the violence inflicted on [Daisy], [Brandon], and [Evan] in [Respondent-Mother's] home(s).

Consistent with the opinion of the North Carolina Court of Appeals in this case, it is improvident to "wait until a child has been killed," or more specifically to wait until *another* child has been killed or another child abused or neglected.

. . . .

21. At the initial disposition of this matter, [Judge] Owsley made the following findings of fact, which were specifically affirmed by the North Carolina Court of Appeals and which this Court now finds to be true.

    a.  The Court recognizes that there has been no specific competent evidence presented to show that [Respondent-Mother] had advance knowledge that [Raul A.] was going to beat [Brandon] on this specific date. However, the Court cannot ignore [Brandon's] statements that such beatings had happened before and "a lot." The Court cannot ignore a three-year history of involvement with this family, with significant serious domestic violence in the home, which was and about which she in fact lied in the past.

    b.  Furthermore, this Court cannot ignore the numerous findings of fact, based on [Respondent-Mother's] own statements to the Court and to professionals who have talked to her throughout the course of this litigation, that she has grown up in a culture of violence and believed she had a duty to her husband and partner and that that duty superseded her duty to protect her children.

    c.  This Court has found on numerous occasions throughout the course of this litigation that [Respondent-Mother] suffered domestic violence at the hands of her then husband, who on occasion left bruises on her by hitting her, who on occasion had forced her to have sex with him against her will, and who on numerous occasions hit and struck their children [Daisy] and [Brandon], leaving bruises on those children.

    d.  Despite the significant domestic violence in her home against her and her children, [Respondent-Mother] stayed in the home of [Armando H.], who was inflicting the violence on her and her children.

    e.  In the Court's Consolidated Order of Adjudication and Disposition, entered by this Court on or about June 3, 2008, the Court found, among other things,

IN RE D.A.H.-C.

[227 N.C. App. 489 (2013)]

based on the testimony of [Respondent-Mother] and others, that [Respondent-Mother] had left her children not only in the care of [Armando H.], who had beaten her and her children and subsequent[ly] caused the death of [Ethan], but also in the care of her brother-in-law [Julio H.], despite her knowledge that he and his wife had a Child Protective Services history and that [Julio H.]'s wife [Erica S.] had been convicted of two counts of misdemeanor child abuse. The Court further found that, not only had [Respondent-Mother] left her children in the care of this person who had this Child Protective Services history and prior court involvement, she also lied to investigators about this during the initial investigation into the death of [Ethan], concealing the fact that she had allowed her children to be in the care of a known abuser.

f. The Court further found in the Consolidated Order of Adjudication and Disposition that [Respondent-Mother] admitted that her husband [Armando H.] had been abusive and violent toward her and her children in the home, but she was reared in a family where she herself was subjected to violence and abuse and that she believed, based on her religious faith, that she was required to stay with her husband. The Court further found that [Respondent-Mother] did not appear to understand the necessity to protect her own children from the violent behaviors of her husband, perhaps because of her longstanding experiences and beliefs, and that she did not take steps to protect these children despite her longstanding knowledge of the violent behaviors of her husband.

22. [Respondent-Mother's] history of denial of domestic violence, her perceived "duty" to succumb to and subjugate herself to domestic violence, her history of lying while violence was inflicted on her and her children bode poorly for her ability to establish such a safe home within a reasonable period of time.

23. [Respondent-Mother's] history of living in environments of violence – with [Armando H.] and with [Raul A.] – has led to the death of one child and two separate adjudications of neglect as to [Daisy], [Brandon], and [Evan], as well as one adjudication of abuse. [Respondent-Mother's] entrustment of [Daisy], [Brandon], and [Evan] to the care of [Julio H.] and [Erica S.] after knowledge of [Erica S.]'s conviction for misdemeanor child abuse, to [Armando H.] after knowledge of his conduct which would lead to convictions for second degree murder and felony child abuse and to [Raul A.] after knowledge of his beating [Brandon] "a lot," when coupled with [Respondent-Mother's] failure to disclose and covering up such violence and abuse, together with [Respondent-Mother's] acknowledged history of condoning domestic violence directed toward her as well as [Daisy], [Brandon], and [Evan] constitutes repeated neglect . . . and the likelihood of repetition of such neglect were the children to once again be returned to her care is substantial.

In her brief, Respondent-Mother argues that the trial court erred by misapprehending our earlier decision upholding Judge Owsley's order requiring the cessation of efforts to reunify Respondent-Mother with the children by treating our opinion as the law of the case and by making findings of fact that lack adequate evidentiary support. We do not find either aspect of Respondent-Mother's argument persuasive.

In support of her "law of the case" argument, Respondent-Mother asserts that the trial court took our earlier statement to the effect that "it is improvident to 'wait until a child has been killed,' or more specifically to wait until *another* child has been killed or another child abused or neglected" out of context since the language was originally used in an opinion regarding the cessation of reunification efforts, which has a different evidentiary standard, rather than in an opinion addressing a challenge to the lawfulness of a termination of parental rights order. Put another way, Respondent-Mother contends that the trial court adopted language from this Court's opinion and treated it as dispositive without regard to the information contained in the present record. On the contrary, the trial court specifically stated in Finding of Fact No. 16 that its independent evaluation of the record revealed the presence of clear, cogent, and convincing evidence tending to show that Respondent-Mother had largely repeated the services that she had obtained following

IN RE D.A.H.-C.

[227 N.C. App. 489 (2013)]

the first removal of the children from her home and that the provision of these services had apparently not influenced her ability or fostered an inclination on her part to avoid or minimize the danger of placing her children in harm's way, as evidenced by Raul A.'s subsequent beating of Brandon, an event which occurred slightly over a year after custody of the children had been returned to Respondent-Mother. As the trial court noted, this finding was consistent with a similar point which this Court made in the course of resolving Respondent-Mother's earlier appeal. When read in context, the challenged portion of the trial court's order simply cannot be understood as substituting this Court's earlier decision for its own decision in this case.

Secondly, Respondent-Mother challenges Finding of Fact No. 21, which consists of an extensive quote from our decision upholding Judge Owsley's order approving the cessation of efforts to reunify Respondent-Mother with the children, as unsupported by the record. Once again, however, the trial court clearly made an independent decision to find as true the fact listed in that portion of the order based on the present record, as is demonstrated by reference in the trial court's order to the fact that it "now finds [these facts] to be true." Moreover, a careful review of the evidence contained in the present record reflects ample support for the specific factual components contained in Findings of Fact Nos. 16 and 21. The record is replete with evidence in the form of both oral testimony and reports tending to show that Respondent-Mother largely repeated the services that she had utilized during her earlier involvement with DSS after they were removed from her custody a second time and that the receipt of these services had had no apparent effect on the manner in which she cared for the children; that Respondent-Mother grew up in a culture of violence and believed that she had a paramount duty to remain with and be loyal to her husband and partner regardless of the impact of that decision on her children; that she elected to stay with her husband and partner after experiencing repeated instances of violence directed at both herself and the children; and that she knowingly left her children with and allowed them to be in the presence of individuals who had a history of child abuse. As a result, this aspect of Respondent-Mother's challenge to the trial court's order lacks merit.

Finally, Respondent-Mother contends that Findings of Fact Nos. 8, 10, 11, 22, and 23 lack adequate evidentiary·support. However, most, if not all, of these findings are supported by the same evidence recited in our discussion of Respondent-Mother's challenge to Finding of Fact No. 21. In addition, we conclude that, even if these findings are deficient in the manner described by Respondent-Mother, any such error

would be harmless given that many of the alleged errors to which Respondent-Mother directs our attention strike us as relatively minor and given that, as is explained in more detail below, the remaining findings of fact provide ample support for the trial court's conclusion that Respondent-Mother's parental rights in Daisy, Brandon, and Evan were subject to termination for neglect. *See In re S.W.*, 175 N.C. App. 719, 724, 625 S.E.2d 594, 597 (holding that "the remaining findings of fact are more than sufficient to support the trial court's conclusions of law"), *disc. review denied*, 360 N.C. 534, 635 S.E.2d 59 (2006). As a result, none of Respondent-Mother's challenges to Findings of Fact Nos. 8, 10, 11, 16, 21, 22, and 23 have merit.

### C. Neglect Determination

[2] Secondly, Respondent-Mother challenges the trial court's determinations that Daisy, Brandon, and Evan are neglected juveniles as defined in N.C. Gen. Stat. § 7B-101(15); that "[s]uch neglect is ongoing and has continued through the dates of these proceedings"; and that "[t]he probability that minor children [Daisy], [Brandon], and [Evan] would again be neglected, if not abused, were they returned to [Respondent-Mother's] care, is substantial." As a result of the fact that all of the trial court's findings of fact either have not been challenged for purposes of appellate review or have been found to have adequate record support, this aspect of Respondent-Mother's challenge to the trial court's order amounts to a contention that the trial court's findings of fact do not support its determination that Respondent-Mother's parental rights in the children were subject to termination for neglect. *See S.N.*, 194 N.C. App. at 146, 669 S.E.2d at 58-59. We do not find this argument persuasive.

According to N.C. Gen. Stat. § 7B-1111(a), a parent's parental rights in his or her children are subject to termination in instances in which "[t]he parent has abused or neglected the juvenile," with a juvenile being deemed to have been "abused or neglected if the court finds the juvenile to be an abused juvenile within the meaning of [N.C. Gen. Stat. §] 7B-101 or a neglected juvenile within the meaning of [N.C. Gen. Stat. §] 7B-101." N.C. Gen. Stat. § 7B-1111(a)(1). A neglected juvenile as defined in N.C. Gen. Stat. § 7B-101 is one

> who does not receive proper care, supervision, or discipline from the juvenile's parent, guardian, custodian, or caretaker; or who has been abandoned; or who is not provided necessary medical care; or who is not provided necessary remedial care; or who lives in an environment injurious to the juvenile's welfare; or who has been placed

for care or adoption in violation of law. In determining whether a juvenile is a neglected juvenile, it is relevant whether that juvenile lives in a home where another juvenile has died as a result of suspected abuse or neglect or lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home.

N.C. Gen. Stat. § 7B-101(15).

A finding of neglect sufficient to terminate parental rights must be based on evidence showing neglect "at the time of the termination proceeding." *In re Ballard*, 311 N.C. 708, 716, 319 S.E.2d 227, 232 (1984). However, the "[t]ermination of parental rights for neglect may not be based solely on past conditions which no longer exist." *Young*, 346 N.C. at 248, 485 S.E.2d at 615. "Where . . . a child has not been in the custody of the parent for a significant period of time prior to the termination hearing, the trial court must employ a different kind of analysis to determine whether the evidence supports a finding of neglect." *In re Pierce*, 146 N.C. App. 641, 651, 554 S.E.2d 25, 31 (2001), *aff'd*, 356 N.C. 68, 565 S.E.2d 81 (2002). "This is because requiring the petitioner in such circumstances to show that the child is currently neglected by the parent would make termination of parental rights impossible." *Id.* (citing *Ballard*, 311 N.C. at 714, 319 S.E.2d at 231).

According to Respondent-Mother, despite the fact that there was evidence of prior neglect, the record developed at the termination hearing did not support the trial court's conclusion that there was a substantial probability that the children would again be neglected. In advancing this argument, Respondent-Mother places substantial reliance on evidence tending to show that she had completed various courses and programs, that she received substantial support from her church, and that her visits with the children had gone well. However, according to the applicable standard of review, the trial court is ultimately responsible for evaluating the weight and credibility to be given to the evidence. As we have already discussed, the trial court's findings of fact, which are either undisputed or supported by competent evidence, indicate that there is a substantial probability that the children will suffer neglect in the future given Respondent-Mother's failure to recognize the conditions which led to the prior adjudications of dependence, neglect, and abuse; her apparent inability to refrain from associating with individuals who will abuse her or the children; and her seemingly unswerving loyalty to her husband or male partner regardless of the manner in which that person treats her children. As best we can tell from examining the trial court's findings, the only difference between Respondent-Mother's

situation between the period following the initial removal of the children from her custody and that following the second is her involvement in a supportive church and religious community and evidence in the form of testimony by members of that community to the effect that she has become more outgoing and assertive. Although such progress is certainly commendable, it is simply not, given the other evidence tending to support the trial court's conclusion of neglect and the deference which must be given to the trial court's determinations concerning the weight and credibility to be given to the evidence, sufficient to persuade us that the trial court erred by determining that Respondent-Mother's parental rights were subject to termination for neglect. *See In re Nolen*, 117 N.C. App. 693, 700, 453 S.E.2d 220, 224-25 (1995) (stating that "[e]xtremely limited progress is not reasonable progress"). As a result, we are unable to conclude that the trial court's findings of fact failed to support its determination that there would be a substantial probability of future neglect or abuse in the event that the children were returned to Respondent-Mother's custody. *In re Y.Y.E.T.*, 205 N.C. App. 120, 131, 695 S.E.2d 517, 524 (explaining that a parent's "case plan is not just a checklist" and that "parents must demonstrate acknowledgement and understanding of why the juvenile entered DSS custody as well as changed behaviors"), *disc. review denied*, 364 N.C. 434, 703 S.E.2d 150 (2010).

## III. Conclusion

Thus, for the reasons set forth above, we hold that the trial court did not err by finding that Respondent-Mother's parental rights in Daisy, Brandon, and Evan were subject to termination pursuant to N.C. Gen. Stat. § 7B-1111(a)(1). As a result, the trial court's orders should be, and hereby are, affirmed.

AFFIRMED.

Judges HUNTER and STROUD concur.