IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-145

No. 363A20

Filed 5 November 2021

IN THE MATTER OF: T.T.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 13 March 2020 by Judge Joy A. Jones in District Court, Harnett County. This matter was calendared in the Supreme Court on 30 September 2021 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Duncan B. McCormick, Staff Attorney, for petitioner-appellee Harnett County Department of Social Services.*

*Mobley Law Office, P.A., by Marie H. Mobley, for appellee Guardian ad Litem.*

*Parent Defender Wendy C. Sotolongo and Assistant Parent Defender J. Lee Gilliam for respondent-appellant mother.*

HUDSON, Justice.

¶ 1    Respondent appeals from the trial court's order terminating her parental rights to her minor daughter, T.T. (Tiffany).[1] After careful review, we affirm.

---

[1] Pseudonyms are used to protect the identities of the juveniles referred to in this opinion and for ease of reading. The order also terminated the parental rights of Tiffany's legal father, Steven, and putative biological father, LaDarion, neither of whom are parties to this appeal.

## I.  Background

On 22 May 2014, Harnett County Department of Social Services (DSS) filed a juvenile petition alleging that ten-year-old Tiffany was neglected and obtained nonsecure custody of her.[2] Tiffany was placed in a foster care placement.

The juvenile petition noted the family's extensive history with social services in Prince George's County, Maryland, and in Rockingham County, North Carolina, prior to DSS becoming involved. The petition alleged that, while the family lived in Maryland, the children were removed from respondent and Steven's care in 2008 and placed in foster care due to domestic violence and Steven's issues with mental health, anger, and substance abuse. After the children were returned to respondent's care, social services in Maryland received a report in 2009 that Riley had been sexually abused by a family friend. Respondent did not comply with the investigation. The petition also noted other investigations of sexual and physical abuse of the children by family friends in the home, which found that respondent had a history of allowing people in her home who placed the children at risk. The petition further alleged that after the family relocated to Rockingham County, reports were made in 2009 and 2010 claiming neglect, lack of care, inappropriate supervision and discipline,

---

[2] DSS also filed juvenile petitions concerning Tiffany's minor siblings—sixteen-year-old J.H. (John), fifteen-year-old A.H. (Aiden), eleven-year-old R.T. (Riley), six-year-old S.T. (Scott), and five-year-old N.T. (Nina)—and obtained nonsecure custody of the siblings. Although referred to in this opinion, Tiffany's siblings were not subjects of the termination proceeding and are not subjects of this appeal.

domestic violence, and an injurious environment. The reports in Rockingham County resulted in a determination in June 2010 that the family was in need of services. However, the family had fled the area and could not be contacted or located.

¶ 4 The petition also alleged that DSS received reports in Harnett County regarding the family on 5 December 2013 and 10 and 21 January 2014. The reports included concerns of neglect, improper supervision and care, inappropriate discipline, domestic violence, substance abuse, and an injurious environment. DSS's assessment of the reports resulted in a case decision that the family was in need of services, and the case was transferred to In-Home Services on 7 February 2014. During a home visit with the family made in order to establish a Family Services Agreement (FSA), social workers had to separate respondent and Steven because they were yelling and screaming at each other in the presence of the children. The petition noted that respondent blamed the social workers for the incident. The petition indicated that respondent entered into a services agreement but alleged she only "minimally complied with the objectives and activities" provided therein.

¶ 5 The petition alleged the children's safety and welfare continued to be a concern despite the services offered, and DSS received reports on 16 and 20 May 2014 about another domestic violence incident between respondent and Steven and about an incident where Nina was almost struck by a utility vehicle while she and Scott were outside near the road unsupervised. Lastly, the petition noted concerns with the

children's school attendance, which was so poor that respondent was charged and incarcerated for Aiden's truancy; the children being out of medication for behavioral problems; respondent's withdrawal of the children from mental health services; and the parents' failure to take John to the dentist for decayed teeth.

¶ 6        On 10 June 2014, respondent agreed to a visitation plan and an Out-of-Home Family Services Agreement (OHFSA). The visitation plan allowed respondent one hour of weekly supervised visitation with the children. The OHFSA required respondent to complete a psychiatric evaluation and follow recommendations, including consistent individual counseling; participate in domestic violence counseling through the SAFE program; complete a psychological evaluation with David Rademacher; enroll in and complete twenty-six weeks of the PRIDE parenting program, which was to include thirteen weeks of anger management classes; and attend regular visits with the children.

¶ 7        On 25 July 2014, the juvenile petition was heard jointly with petitions for Tiffany's siblings, and the trial court entered a combined adjudication and disposition order for all the children. The trial court adjudicated Tiffany and her siblings neglected juveniles based on findings of fact echoing the allegations in the juvenile petition, including that respondent and Steven did not provide appropriate care or supervision to the children and exposed the children to domestic violence and that the children lived in an environment injurious to their welfare. The trial court

awarded DSS custody of the children; continued respondent's visitation in accordance with an amended visitation plan; continued DSS's reunification efforts; endorsed respondent's OHFSA; and ordered respondent to demonstrate her compliance with all aspects of her OHFSA, to sign any consents or releases for information requested by DSS or the guardian ad litem (GAL), and to refrain from discussing the case with the children or encouraging the children to run away from foster care, which the trial court found she had done during visits. The trial court found that Steven had moved to Washington, D.C. after the children's removal from the home and had not entered a services agreement.

¶ 8    The case came on for a permanency planning review hearing on 17 October 2014, and the trial court entered its order on the same day. The trial court's findings reflect respondent's initial engagement in her OHFSA but subsequent failure to follow through with services. The trial court found respondent had completed a psychiatric evaluation with Daymark and a psychological evaluation with David Rademacher. The psychological evaluation resulted in diagnoses of adjustment disorder not otherwise specified, personality disorder not otherwise specified, and cannabis abuse, as well as recommendations for parenting classes, substance abuse counseling, psychotherapy, and domestic violence counseling. Dissatisfied with the results of the psychological evaluation, respondent refused to sign a release allowing the evaluation to be forwarded to Daymark for services. The court found respondent

did not want to participate in psychotherapy or any similar service. The court also found that respondent had completed intake and started domestic violence counseling sessions through the SAFE program and that she had completed intake and started parenting and anger management classes in the PRIDE program. However, respondent's attendance had been inconsistent, and she had to restart classes due to absences. Respondent also tested positive for marijuana and brought a "shank" to the PRIDE program classes in August 2014. Because of the positive drug screen, it was recommended in September 2014 that respondent also complete thirteen weeks of Recovery Strategies, a substance abuse treatment program provided by the PRIDE parenting program. Lastly, the court found respondent regularly attended visits with the children but noted concerns with the visits, including: respondent did not use skills from parenting classes to correct the children's out-of-control behavior; the visits were often loud and chaotic; respondent encouraged the children to disregard instructions from the social worker; and the GAL overheard inappropriate conversations between respondent and the children and observed respondent become aggressive, angry, upset, and confrontational.

¶ 9        In the 17 October 2014 permanency planning order, the trial court continued DSS's custody of the children, set the permanent plan for the children as reunification with respondent, and continued respondent's visitation with directives that she refrain from discussing certain topics with the children. The court ordered respondent

to comply with all aspects of her OHFSA, including the signing of requested releases of information, completion of anger management and parenting classes through the PRIDE program, and participation in psychotherapy or another form of therapeutic counseling. The court additionally ordered respondent to refrain from illegal drug use, begin thirteen weeks of the Recovery Strategies substance abuse program upon her completion of thirteen weeks of anger management through the PRIDE program, and cooperate with home visits by DSS and the GAL.

¶ 10    The next permanency planning hearing was conducted over the course of 22 May and 12 June 2015. In an order entered on 30 July 2015, the trial court found that Steven had returned from Washington, D.C., resumed his relationship with respondent, and continued to live in the same home as respondent. The court found that respondent reported she returned to Daymark for group therapy in March 2015 and that she signed a release for Daymark to provide DSS with her records in April 2015. However, respondent revoked her release before Daymark could provide records to DSS. The court's findings also show that respondent's participation in domestic violence counseling through the SAFE program and participation in parenting, anger management, and substance abuse classes through the PRIDE program remained inconsistent, and respondent would have to restart all classes in the PRIDE program due to absences. The court's findings noted that respondent completed twelve hours of anger management classes through a program in

Fayetteville, but the court also found that there continued to be arguments and fights between respondent and Steven, and between respondent and her adult daughter. Moreover, the court found respondent had been late to almost every visit; some visits were canceled; visits remained loud and chaotic; respondent did not correct the children and encouraged misbehavior; respondent often argued with the staff supervising visits, one time refusing to leave until being escorted away by a sheriff's deputy; and respondent continued to discuss the case with the children. Lastly, the court found it concerning that respondent minimized her own responsibility for the circumstances; respondent was always on call for her job as a taxi driver and indicated she would rely on her adult daughter to care for the children; and respondent reported a plan to move to Fayetteville with some of the children while leaving other children to live with her adult daughter or Steven. Based on its findings, the trial court ceased reunification efforts with respondent, suspended respondent's visitation with the children, and changed the permanent plan to guardianship.

¶ 11    The case continued to come on for regular permanency planning review hearings until the termination hearing. There were few updates from the hearings related to respondent and Tiffany's case,[3] and the trial court consistently found

---

[3] Regarding Tiffany's siblings: John and Aiden reached the age of majority during the case; Scott and Nina were placed in legal guardianship with a paternal great aunt, and further review hearings in their cases were waived; and Riley remained in DSS custody, and her primary permanent plan changed to APPLA (Another Planned Permanent Living Arrangement) upon her reaching the age of sixteen.

respondent had not made significant progress and reunification efforts should remain ceased. Following a hearing on 11 March 2016, the court added custody with a relative or other suitable person as a secondary permanent plan while continuing guardianship as Tiffany's primary permanent plan. Following a hearing on 1 June 2018, the court found that Tiffany wanted to be adopted by her foster parents, with whom she had been placed since entering DSS custody on 22 May 2014 and that her foster parents were willing to adopt her. By order entered 6 July 2018, the trial court changed the primary permanent plan for Tiffany to adoption and the secondary permanent plan to guardianship.

¶ 12    On 29 November 2018, DSS filed a termination petition alleging grounds existed to terminate respondent's parental rights to Tiffany pursuant to N.C.G.S. § 7B-1111(a)(1)–(3) for neglect, willful failure to make reasonable progress, and willful failure to pay a reasonable portion of Tiffany's cost of care. After numerous continuances and after respondent filed an answer to the petition opposing termination on 28 August 2019, the termination petition was heard on 27 September 2019. On 13 March 2020, the trial court entered an order terminating respondent's parental rights. The trial court concluded that all three of the alleged grounds existed

---

After it was reported that LaDarion may be Tiffany's biological father, the trial court made him a party to Tiffany's case as a putative father on 1 November 2016 and allowed visitation between Tiffany and LaDarion. However, reunification efforts with LaDarion were ceased on 30 June 2017 due to his failure to exercise visitation rights or establish paternity.

to terminate respondent's parental rights to Tiffany and that termination was in Tiffany's best interests. Respondent appealed.

## II. Analysis

On appeal, respondent challenges the trial court's adjudication of the existence of grounds to terminate her parental rights.

### A. Standard of Review

This Court has explained the standard of review for termination of parental rights appeals as follows:

> Proceedings to terminate parental rights consist of an adjudicatory stage and a dispositional stage. At the adjudicatory stage, the petitioner bears the burden of proving by clear, cogent, and convincing evidence that one or more grounds for termination exist under section 7B-1111(a) of the North Carolina General Statutes. We review a trial court's adjudication under N.C.G.S. § 7B-1109 to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law. The trial court's conclusions of law are reviewable de novo on appeal.

*In re K.H.*, 375 N.C. 610, 612 (2020) (cleaned up).

### B. Grounds for Termination

The trial court terminated respondent's parental rights to Tiffany on grounds of neglect, willful failure to make reasonable progress, and willful failure to pay a reasonable portion of Tiffany's cost of care. *See* N.C.G.S. § 7B-1111(a)(1)–(3) (2019). "It is well established that an adjudication of any single ground for termination under N.C.G.S. § 7B-1111(a) will suffice to support a trial court's order terminating parental

rights." *In re L.M.M.*, 375 N.C. 346, 349 (2020).

The trial court may terminate parental rights pursuant to N.C.G.S. § 7B-1111(a)(2) upon finding "[t]he parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile." N.C.G.S. § 7B-1111(a)(2). This Court has explained that

> [t]ermination under this ground requires the trial court to perform a two-step analysis where it must determine by clear, cogent, and convincing evidence whether (1) a child has been willfully left by the parent in foster care or placement outside the home for over twelve months, and (2) the parent has not made reasonable progress under the circumstances to correct the conditions which led to the removal of the child.

*In re Z.A.M.*, 374 N.C. 88, 95 (2020).

Relevant to the adjudication of grounds to terminate respondent's parental rights under N.C.G.S. § 7B-1111(a)(2), the trial court made the following findings of fact based on clear, cogent and convincing evidence concerning Tiffany's removal from the home and placement in DSS custody and respondent's lack of progress to correct the conditions leading to Tiffany's removal:

> 1. On 22 May 2014, [DSS] filed a juvenile petition alleging [Tiffany] and siblings to be neglected. On the same day, a court entered nonsecure orders placing [Tiffany] and siblings in nonsecure custody of DSS with authority for care and placement. . . .

. . . .

4.  A court conducted a permanency planning review hearing on May 22 and June 12, 2015. . . . The court ceased reunification efforts with the mother, suspended the mother's visitation, and changed the permanent plan to guardianship . . . .

. . . .

13. DSS filed a petition to terminate parental rights of [respondent] . . . on November 29, 2018.

. . . .

28. [Tiffany] has been in the custody of DSS since May 22, 2014.

. . . .

30. [Tiffany] and her siblings lived with [respondent] and [Steven] prior to the filing of the underlying juvenile petitions on May 22, 2014.

31. DSS received child protective services reports as to the family in December 2013 and January 2014.

32. DSS found the family to be in need of services. DSS transferred the case to in-home services on February 7, 2014.

33. During a social worker's attempt at a home visit, [respondent] and [Steven] yelled and screamed at each other to the point [respondent] felt the need to remove [Tiffany] and the siblings from the situation. . . . [Respondent] blamed the social worker for the incident.

34. The social worker separated [respondent] and [Steven]. The social worker was able to formulate an agreement with [respondent].

35. [Respondent] . . . minimally complied with the objectives and activities on [her] case plan during the provision of in-home services.

36. [Respondent] withdrew [Tiffany] and the siblings from their mental health services.

37. [Respondent] delayed seeking other services.

38. [Respondent] was charged and incarcerated for a school attendance law violation with respect to an older sibling, [Aiden].

39. [Respondent] withdrew a younger sibling, [Scott], from kindergarten. [Scott] was a second[-]year kindergarten student at the time of his withdrawal.

40. On May 16, 2014, DSS received a report of neglect, domestic violence[,] and injurious environment due to an incident between the [respondent] and [Steven]. The argument escalated. [Respondent] attempted to leave with an adult daughter. [Steven] jumped on top of the van. [Steven] banged and kicked the windshield of the van as [respondent] drove away. [Tiffany] was present at the time of the incident. [Tiffany] witnessed the incident.

41. On May 20, 2014, DSS received a report of neglect, improper supervision, and injurious environment. The reporter found younger siblings, [Nina] and [Scott], outside near the road unsupervised. The reporter knocked on the door. The reporter informed [respondent] and an adult daughter that the siblings were outside unsupervised.

42. [Nina] was in the road. A truck slammed on brakes to avoid hitting her.

43. [Respondent] and [Steven] exposed [Tiffany] to domestic violence at the time of and prior to the filing of the underlying juvenile petition.

44. [Tiffany] described violence between [respondent] and [Steven]. They struck each other. They threw things at each other. [Tiffany] saw bruises on [respondent], but she did not see any serious injuries.

45. [Tiffany] described seeing [respondent] and [Steven] verbally argue.

. . . .

48. [Respondent] and [Steven] did not provide appropriate care or supervision to [Tiffany] at the time of and prior to the filing of the underlying juvenile petition.

49. [Tiffany] lived in an environment injurious to her welfare in the home of [respondent] and [Steven] at the time of and prior to the filing of the underlying juvenile petition.

. . . .

52. [Respondent] and [Steven] argued with each other in the presence of others in April 2015.

53. [Respondent] in 2015 revoked a consent to allow DSS to review records at Daymark Recovery Services.

54. [Respondent] was required to participate in domestic violence counseling through SAFE. [Respondent] did not complete that program.

55. [Respondent] and an adult daughter fought in the home on April 15, 2015. [Steven] intervened on the side of the adult daughter. [Respondent] got upset and accused the adult daughter of sleeping with [Steven].

56. [Respondent] and [Steven] got into a scuffle several weeks after the April 15, 2015 incident when [Steven] purchased windows that were too big.

57. [Respondent] was required to enroll and complete

parenting classes at PRIDE.

58.  [Respondent] did not complete the PRIDE program.

59.  [Respondent] completed a 12-hour parenting class in Fayetteville, but this class was not the equivalent of PRIDE.

60.  [Respondent] was referred to the Recovery Strategies program at PRIDE following a positive drug screen. [Respondent] did not complete this program.

61.  [Respondent] did not make any significant progress on her case plan between 2015 and the date of this hearing.

62.  [Respondent] did not complete an anger management program.

63.  [Respondent] did not complete an intensive parenting education program.

64.  [Respondent] did not complete a substance abuse treatment program.

65.  [Respondent] did not participate in consistent, regular, therapeutic counseling.

¶ 18        Based on these findings of fact, the trial court found and concluded that respondent willfully left Tiffany in foster care or placement outside the home for more than twelve months prior to the filing of the termination petition without showing to the satisfaction of the court that reasonable progress under the circumstances had been made in correcting the conditions which led to Tiffany's removal. The court thus concluded grounds existed to terminate respondent's parental rights pursuant to N.C.G.S. § 7B-1111(a)(2).

¶ 19    Respondent does not challenge any of the above findings of fact. "Findings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. 403, 407 (2019) (citing *Koufman v. Koufman*, 330 N.C. 93, 97 (1991)).

¶ 20    Respondent's challenges to the trial court's adjudication of grounds for termination under N.C.G.S. § 7B-1111(a)(2) focus on the second step of the analysis regarding reasonable progress. *See In re Z.A.M.*, 374 N.C. at 95. Respondent argues the trial court's findings do not support the court's determination that she failed to make reasonable progress under the circumstances to correct the conditions that led to Tiffaney's removal. We disagree.

¶ 21    This Court has explained,

> parental compliance with a judicially adopted case plan is relevant in determining whether grounds for termination exist pursuant to N.C.G.S. § 7B-1111(a)(2). A trial court should refrain from finding that a parent has failed to make reasonable progress in correcting the conditions that led to the children's removal simply because of his or her failure to fully satisfy all elements of the case plan goals. However, a trial court has ample authority to determine that a parent's extremely limited progress in correcting the conditions leading to removal adequately supports a determination that a parent's parental rights in a particular child are subject to termination pursuant to N.C.G.S. § 7B-1111(a)(2).

*In re E.C.*, 375 N.C. 581, 585 (2020) (cleaned up).

¶ 22    Here, the evidence and unchallenged findings establish the conditions

resulting in Tiffany's removal from the home were domestic violence, improper care and supervision, and an injurious environment. It is undisputed that respondent agreed to an OHFSA with DSS on 10 June 2014 with components to address domestic violence and parenting. The OHFSA specifically required respondent to participate in domestic violence counseling through the SAFE program and to complete twenty-six weeks of the PRIDE parenting program, which was to include thirteen weeks of anger management. The OHFSA also required respondent to complete psychiatric and psychological evaluations and follow all recommendations, including individual counseling. There is no contention that the OHFSA requirements were not directly or indirectly related to addressing the conditions of removal. As set forth in the trial court's findings above, the trial court found that respondent did not complete the required domestic violence counseling through the SAFE program and that she did not complete the required parenting classes through the PRIDE program. The court found respondent completed a different parenting program, but the program was not the equivalent of the PRIDE program specified in the OHFSA. The court also found respondent was referred to the Recovery Strategies substance abuse program at PRIDE following a positive drug screen, but she did not complete the substance abuse program. Lastly, in findings sixty-one through sixty-five, the trial court succinctly found that respondent had not completed each of the programs required by her OHFSA and had not made "any significant progress on her case plan between 2015

and the date of [the termination] hearing."

Respondent does not contest the trial court's findings that she did not complete the requirements of her case plan. She instead argues her lack of case plan progress is not dispositive, and there was no evidence that the conditions that led to Tiffany's removal still existed. Respondent relies on the Court of Appeals' decisions in *In re Y.Y.E.T.*, 205 N.C. App. 120, 131, *disc. review denied*, 364 N.C. 434 (2010), and *In re D.A.H.-C.*, 227 N.C. App. 489, 501 (2013), which note that a "case plan is not just a check list" and that "parents must demonstrate acknowledgement and understanding of why the juvenile entered DSS custody as well as changed behaviors." We are not persuaded the trial court erred and believe respondent's reliance on these Court of Appeals cases is misplaced.

In both *In re Y.Y.E.T.* and *In re D.A.H.-C.*, the court reviewed the termination of parental rights decision on grounds of neglect under N.C.G.S. § 7B-1111(a)(1). *In re Y.Y.E.T.*, 205 N.C. App. at 127–30; *In re D.A.H.-C.*, 227 N.C. App. at 499–501. Nevertheless, the court addressed arguments in each case that termination was improper because the respondents had made progress in their case plans.[4] *In re Y.Y.E.T.*, 205 N.C. App. at 130–31; *In re D.A.H.-C.*, 227 N.C. App. at 500. Although

---

[4] In *In re Y.Y.E.T.*, the respondent raised his compliance with his case plan as an argument challenging disposition. 205 N.C. App. at 130–31. The trial court addressed the argument but noted "compliance with the case plan is not one of the factors the trial court is to consider in making the best interest determination." *Id.* at 131.

noting the respondents' progress, the court upheld termination in each case. *In re Y.Y.E.T.*, 205 N.C. App. at 131; *In re D.A.H.-C.*, 227 N.C. App. at 501. It was in this context—where the respondents had shown progress in their case plans, but the trial court nevertheless found a repetition of neglect was likely because the respondents had not demonstrated changed behavior—that the court noted a "case plan is not just a check list[.]" *In re Y.Y.E.T.*, 205 N.C. App. at 131 (explaining that despite the respondent's case plan compliance, he refused to acknowledge how the juvenile was injured and who perpetrated the injury); *In re D.A.H.-C.*, 227 N.C. App. at 500–01 (explaining that despite the respondent's progress, she failed to recognize the conditions which led to the prior adjudications and continued to associate with individuals who mistreat her children). Neither case stands for the proposition that a lack of case plan compliance should be overlooked in determining whether there has been reasonable progress under N.C.G.S. § 7B-1111(a)(2).

Unlike *In re Y.Y.E.T.* and *In re D.A.H.-C.*, this is not a case where there was substantial case plan compliance.[5] This is not even a case where respondent completed some aspects of her case plan and where we are left to judge whether the

---

[5] Respondent also cites to *In re J.S.L.*, 177 N.C. App. 151 (2006), asserting that the Court of Appeals reversed a termination of parental rights order based on N.C.G.S. § 7B-1111(a)(2) because the trial court found only one specific instance of domestic violence after the removal of the children from the home. However, the court's reversal in *In re J.S.L.* was not based solely on the lack of findings of specific instances of domestic violence in the home. As in *In re Y.Y.E.T.* and *In re D.A.H.-C.*, and unlike the instant case, the respondent in *In re J.S.L.* had substantially complied with the requirements of his case plan. *In re J.S.L.*, 177 N.C. App. at 163–64, 628 App. at 394.

trial court's determination that respondent failed to make reasonable progress is sound. It is clear in this case that respondent did not complete any of the programs required in her OHFSA to correct the conditions resulting in Tiffany's removal. We are satisfied the findings in this case, that respondent did not complete the programs required by her OHFSA to address the domestic violence and parenting issues in the home, are supported by the evidence of record and support the trial court's determination that respondent had not made reasonable progress under the circumstances to correct the conditions leading to Tiffany's removal.

## III. Conclusion

¶ 26        We conclude that the trial court did not err in finding grounds existed to terminate respondent's parental rights to Tiffany under N.C.G.S. § 7B-1111(a)(2). Because "an adjudication of any single ground for termination under N.C.G.S. § 7B-1111(a) will suffice to support a trial court's order terminating parental rights[,]" *In re L.M.M.*, 375 N.C. at 349, we need not address respondent's arguments regarding N.C.G.S. § 7B-1111(a)(1) and (3), the other grounds adjudicated by the trial court. Furthermore, respondent does not contest the trial court's conclusion that termination of her parental rights was in Tiffany's best interests. *See* N.C.G.S. § 7B-1110(a) (2019). Accordingly, we affirm the trial court's termination order.

AFFIRMED.