IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA24-807

Filed 7 May 2025

Mecklenburg County, No. 22JT000347-590

IN THE MATTER OF: I.M.S.

Appeal by Respondent Mother from order entered 21 May 2024 by Judge J. Rex Marvel in Mecklenburg County District Court. Heard in the Court of Appeals 23 April 2025.

*Mecklenburg County Attorney's Office, by Kristina A. Graham, for Petitioner-Appellee Mecklenburg County Department of Social Services.*

*Administrative Office of the Courts, by Brittany T. McKinney, for Guardian ad Litem.*

*J. Thomas Diepenbrock for Respondent-Appellant Mother.*

COLLINS, Judge.

Respondent Mother ("Mother") appeals from the trial court's order terminating her parental rights to her minor child Imelda[1] on the following four grounds: neglect; willfully leaving the child in placement outside the home for more than 12 months without correcting the conditions which led to the child's removal; dependency; and the parental rights of the parent, with respect to another child, have been terminated involuntarily. We affirm.

---

[1] We use a pseudonym to protect the minor child's identity. *See* N.C. R. App. P. 42(b).

## I.    Background

Petitioner Mecklenburg County Department of Social Services, Division of Youth and Family Services ("YFS") filed a petition in August 2022 alleging that Imelda was neglected and dependent and received nonsecure custody of her.  The trial court entered an Adjudication Order on 5 January 2023 adjudicating Imelda neglected and dependent.  Mother stipulated to the following allegations in the Partially Mediated Agreement, which the trial court incorporated in its Adjudication Order as findings of fact:

> (a) Youth and Family Services (YFS) became involved with this family upon receipt of a Child Protective Services (CPS) report requiring an immediate response on August 3, 2022, alleging neglect due to concerns that [Mother] and [Imelda] were currently living out of a van with no A/C, [Mother] refused to go to a shelter, and she had no money for housing or any food to provide [Imelda] other than milk.  [Mother] has no personal knowledge of the report received.
>
> (b) The report also indicated that [Mother] and [Imelda] arrived in Charlotte, NC from Louisville, KY on or about July 5, 2022, at which time she contacted her brother to let him know she was in North Carolina.  She and [Imelda] were unable to stay with the maternal uncle, so since her arrival in the area, [Mother] and [Imelda] have stayed in various hotels between Charlotte and Gastonia.  [Mother] has no personal knowledge of the report received.
>
> (c) On the evening of August 3, 2022, [Mother] and [Imelda] were found by petitioner in [Mother's] mini van parked in the lot of the QT gas station on South Blvd.  The petitioner observed the van to be packed full of [Mother's] and [Imelda's] belongings.  There was no

space for [Imelda] to lie down and she was sleeping in her car seat. [Imelda] was observed to have a scratch on her nose. [Mother] advised the petitioner that the scratch happened when [Imelda] fell at the waterpark.

(d) The petitioner observed there to be no food for [Imelda] in the vehicle. [Mother] informed the petitioner that they have just eaten. The petitioner observed only one container of milk. [Mother] stated that she doesn't have any FNS benefits to purchase food. [Mother] reported that she applied for WIC and food stamps but has not received the benefits yet due to her case not being closed in KY.

(e) When the petitioner first approached the vehicle, she observed a gentleman to be sitting in the van with [Mother] and [Imelda]. When asked who the gentleman was, [Mother] admitted that she didn't know him. She stated that he was walking through the parking lot, saw that she was a nice person, and asked her to give him a ride up the hill.

(f) [Mother] admitted that her vehicle doesn't currently have working A/C, however [Mother] stated that she purchased a fan for [Imelda]. [Mother] informed the petitioner that the van was having issues with the battery, but she has jumper cables. The temperatures in the Charlotte area have been in the 90s over the past few weeks.

(g) [S]he is waiting to receive a large tax refund and she plans to obtain housing once she receives that money.

(h) [Mother] indicated that she has no other family in this area other than her brother. [Mother] was first hesitant to share her brother's contact information with the department. She first contacted her brother directly to ensure it was appropriate for her to share his contact information. [Mother] then provided his contact information to the petitioner. The petitioner contacted the maternal uncle, and he was either unable or unwilling to provide care for [Imelda]. [Mother] has no

personal knowledge of the content of the conversation that took place between the petitioner and maternal uncle.

(i) The maternal uncle shared with the petitioner multiple concerns that he has regarding [Imelda's] well-being in the care of [Mother]. The uncle stated that he has attempted to help [Mother] and [Imelda] get into shelters in Charlotte and Gastonia, but [Mother] hasn't followed through and has refused to go to a shelter which is why she and [Imelda] are now residing in the van. [Mother] has no personal knowledge of the content of the conversation that took place between the petitioner and the maternal uncle. The uncle paid for [Mother] and [Imelda] to stay in a hotel for approximately 4 days last week.

(j) Upon information and belief, [Mother] has 5 other children of whom she lost custody of in Florida or in Puerto Rico.

(k) [Mother] admitted that she has CPS history involving [Imelda] in Kentucky. She stated that she doesn't recall what the CPS issues were in her case.

(l) The petitioner explored paternity with [Mother]. She stated that [Imelda's] biological father is Andrew Soto, he is approximately 35 years old, and he is a Hispanic/Male. She stated that she doesn't know his whereabouts or how to contact him because he left after [Imelda] was conceived in Louisville, KY.

(m) Petitioner questioned the maternal uncle about paternity, and he confirmed that the name of the biological father is Andrew Soto, and he is believed to live in the Charlotte area. [Mother] has no personal knowledge of this conversation.

The trial court entered a Disposition Order maintaining custody of Imelda with YFS.

In April of 2023, the trial court held a permanency planning hearing and

ordered a primary plan of reunification and a secondary plan of adoption. In August of 2023, the trial court ordered a primary plan of adoption and a secondary plan of reunification.

YFS filed a Motion to Terminate Parental Rights on 13 September 2023. Following a hearing, the trial court entered a Termination of Parental Rights Order terminating Mother's parental rights. The trial court concluded that there were four grounds to terminate Mother's parental rights: Mother had neglected Imelda and "it is probable that there would be a repetition of neglect . . . if [Imelda] is returned to" Mother's care, N.C. Gen. Stat. § 7B-1111(a)(1), Mother had "willfully left [Imelda] in placement outside of the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of [Imelda]," *id.* § 7B-1111(a)(2), Mother "is incapable of providing proper care and supervision of [Imelda], such that . . . [Imelda] is a dependent . . . and that there is a reasonable probability that the incapability will continue for the foreseeable future," *id.* § 7B-1111(a)(6), and the "parental rights of [Mother] with respect to another child of [Mother] have been terminated involuntarily by a court[.]" *Id.* § 7B-1111(a)(9).

The trial court proceeded to disposition and concluded that termination of Mother's parental rights was in Imelda's best interests, and it ordered termination of Mother's parental rights. Mother appealed.

## II. Discussion

A termination-of-parental-rights proceeding is a two-step process. *In re D.A.H.-C.*, 227 N.C. App. 489, 493 (2013). In the initial adjudication phase, the petitioner has the burden to "show by clear, cogent[,] and convincing evidence that a statutory ground to terminate exists" under N.C. Gen. Stat. § 7B-1111. *Id.* (quotation marks and citation omitted). If the petitioner meets its evidentiary burden with respect to a statutory ground and the trial court concludes that the parent's rights may be terminated, then the matter proceeds to the disposition phase, at which the trial court determines whether termination is in the best interests of the child. *In re T.D.P.*, 164 N.C. App. 287, 288 (2004). If, in its discretion, the trial court determines that it is in the child's best interests, the trial court may then terminate the parent's rights. *In re Howell*, 161 N.C. App. 650, 656 (2003).

Pursuant to N.C. Gen. Stat. § 7B-1111(a), a trial court may terminate parental rights upon a finding of one of eleven enumerated grounds. We review the trial court's order to determine "whether the trial court's findings of fact were based on clear, cogent, and convincing evidence." *In re Oghenekevebe*, 123 N.C. App. 434, 435-36 (1996) (citation omitted). "Any unchallenged findings of fact are presumed to be supported by competent evidence and are therefore binding on appeal." *In re J.A.K.*, 258 N.C. App. 262, 268 (2018) (citation omitted).

If satisfied that the record contains the requisite evidence supporting the findings of fact, this Court must then determine whether the findings of fact support the trial court's conclusions of law. *In re S.N.*, 194 N.C. App. 142, 146 (2008). This

Court reviews the trial court's legal conclusions de novo. *Id.* Finally, with respect to the disposition phase, we review a trial court's decision that termination is in the best interests of the child for abuse of discretion and will reverse only where the trial court's decision is "manifestly unsupported by reason." *Id.* (quotation marks and citation omitted).

## A. Grounds for Termination

### 1. Neglect

Mother contends that clear, cogent, and convincing evidence does not support the trial court's ultimate findings and conclusions that Imelda's neglect would be repeated in the future if she was returned to Mother's care.

A trial court may terminate parental rights under N.C. Gen. Stat. § 7B-1111(a)(1) if it determines that the parent has neglected the child within the meaning of N.C. Gen. Stat. § 7B-101(15). N.C. Gen. Stat. § 7B-1111(a)(1) (2023). A neglected juvenile is defined, in relevant part, as a juvenile "whose parent, guardian, custodian, or caretaker . . . [d]oes not provide proper care, supervision, or discipline" or "[c]reates or allows to be created a living environment that is injurious to the juvenile's welfare." *Id.* § 7B-101(15)(a), (e) (2023).

> Termination of parental rights based upon this statutory ground requires a showing of neglect at the time of the termination hearing, or, if the child has been separated from the parent for a long period of time, there must be a showing of past neglect and a likelihood of future neglect by the parent.

*In re D.L.W.*, 368 N.C. 835, 843 (2016). "When determining whether such future

neglect is likely, the [trial] court must consider evidence of changed circumstances

occurring between the period of past neglect and the time of the termination hearing."

*In re Z.V.A.*, 373 N.C. 207, 212 (2019) (citation omitted). Here, the trial court made

the following relevant findings of fact regarding past neglect and a likelihood of future

neglect:

> 11. [Imelda] came to the attention of YFS from a report that Mother was living with [Imelda] in a vehicle at a gas station without a place to stay. There were also concerns about [Mother's] ability to care for her.
>
> 12. [Imelda] was placed in the non-secure custody of YFS on August 4, 2022. She has remained in the custody of YFS since that date.
>
> 13. [Imelda] was adjudicated neglected and dependent on or about November 15, 2022. A disposition hearing was also held on November 17, 2022.
>
> 14. [Mother's] housing instability and lack of appropriate resources were the main removal conditions in the underlying matter. There were also concerns about mental health and substance abuse due to [M]other's previous involvement with CPS in Kentucky. Further, the [c]ourt found concerns regarding Mother having her five older children removed from her custody and her parental rights terminated in Florida. As part of the disposition order, the [c]ourt adopted an out-of-home family services agreement (OHFSA) for [Mother] that included: attending parenting classes to demonstrate and display active parenting techniques to understand the developmental and emotional needs of [Imelda]; secure safe and appropriate housing suitable for [Imelda][;] obtain and maintain sufficient income; and completing a FIRST assessment to address substance abuse and mental health and follow all

recommendations[.]

15. Mother was [o]rdered to participate in FIRST (Families in Recovery Stay Together). She attended the screening and was not recommended for services, but later tested positive for marijuana and alcohol. The [c]ourt [o]rdered for [Mother] to participate in a Parent Focused Parenting Evaluation (PFPE) to determine whether the services previously offered to [Mother] were appropriate and to determine if there were other services that could be offered.

16. [Mother] did participate in the PFPE, and Dr. Hancock determined that [M]other does have a lower functioning IQ and looked at [Mother's] long history of DSS involvement in Florida with her five older children. Those children were removed for concerns surrounding substance abuse and [Mother] not meeting their basic needs.

17. Mother was diagnosed with post traumatic stress disorder (PTSD) and substance abuse disorder. The [c]ourt finds that based on the testimony provided by Dr. Hancock and review of the PFPE, [Mother] lacks insight regarding her circumstances and her past. [Mother] would likely benefit from therapeutic intervention but the reality is that she has not engaged in the recommended and referred services throughout the life of the case.

18. There was testimony and argument surrounding the recommendation in the PFPE that a more in-depth Parental Capacity Evaluation would be beneficial. The [c]ourt made the decision that it was largely unnecessary and that a further evaluation would cause undue delay at a time where Mother was not acting consistent with YFS or her parental rights, was not visiting with [Imelda], had moved to Florida and reunification was unlikely in six months. The [c]ourt finds that further evaluation would only aid prolonging this case and permanence for [Imelda] largely based on the fact that [Mother] has not engaged in the recommended services thus far.

19. Mother has been afforded visitation with [Imelda] throughout the life of this case, but has not been consistent

in exercising visitation. Further, since [Imelda] was brought into custody [Mother] has left North Carolina three times to return to Florida for a total of approximately eight months of the eighteen months that [Imelda] has been in YFS custody, and currently resides in Florida although her exact location is unknown. During those absences, [Mother] forfeited her in-person visitations with [Imelda].

20. There was no credible evidence presented that as of today [Mother] has participated in mental health treatment, parenting classes, or has suitable housing. There was no credible evidence that [Mother] has stable or appropriate housing.

21. Mother does receive disability income but refuses to disclose the reason that it is received. Further, [Mother] has consistently claimed to have employment throughout the life of the case but has not provided pay stubs to the department to determine whether she is gainfully employed.

22. YFS has made efforts to move [Mother's] services to North Carolina to aid in reunification, but she made the choice to refuse this help throughout the life of the case.

. . . .

25. At the time of this hearing[,] [Mother] and [Imelda's father] have not made efforts to complete their OHFSA, meaningfully engage in any case planning with the department, or ameliorate the condition that led to the removal of [Imelda].

26. [Mother] was not married to any man at the time of [Imelda's] birth or conception, and no man has come forward claiming to be [Imelda's] father, filed an affidavit of paternity, asked for contact with [Imelda] or provided any support.

27. [Imelda] has not had any contact with John Doe or any other man claiming to be her biological father. Further,

there has been no man that has legitimated this child, provided to her cost of care or provided for her since birth.

28. [Imelda] has been placed with Thomas and Emily White since August 23, 2022. The Whites have consistently provided love and support to [Imelda]. They have three older children, and the foster brother closest in age to [Imelda] is her best friend.

29. [Imelda] acknowledges, knows, and loves her mother, but there is no parental relationship. [Mother] is not the person that takes her to the doctor, puts her to bed, feeds her, and has not had in person contact with [Imelda] since November 2023.

30. [Mother] has prior history with DSS in Kentucky and Florida. She has five older children who were removed from her custody in Florida. Her rights were terminated to those five children.

31. Adoption has been part of the primary plan since the second permanency planning hearing on February 14, 2023. The [c]ourt found at all three permanency planning hearings that were held in the underlying matter that neither parent was making progress within a reasonable time and both parents were acting in a manner inconsistent with the health and safety of [Imelda].

32. The probability of neglect is high should [Imelda] be returned to the home of [Mother] or [Imelda's father].

In making these findings of fact, the trial court considered testimony from Dr. Russell Hancock, the psychotherapist who evaluated Mother; Natalie Smith, the YFS worker assigned to the case; Blair Wrangham, the Guardian ad Litem volunteer; and Emily White, Imelda's foster mother. The trial court also considered Dr. Hancock's Parenting Focused Psychological Evaluation of Mother and the Guardian ad Litem's TPR report. Thus, there is clear, cogent, and convincing evidence in the record to

support the trial court's findings of fact, including that the neglect experienced by Imelda would repeat or continue if she were returned to Mother's care and custody.

Furthermore, because the trial court properly terminated Mother's parental rights based on neglect, we need not address the three remaining grounds for termination. *See In re C.J.H.*, 240 N.C. App. 489, 497 (2015) ("On appeal, respondent challenges all three of the trial court's grounds for termination of his parental rights. But if we determine that the findings of fact support one ground for termination, we need not review the other challenged grounds.").

## III.    Conclusion

The trial court did not err by concluding that neglect existed to terminate Mother's parental rights. Mother does not challenge the trial court's dispositional determination that termination was in Imelda's best interest. Accordingly, we affirm the trial court's order terminating Mother's parental rights.

AFFIRMED.

Judges MURRY and FREEMAN concur.